# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### January 10, 2017 Session

## STATE OF TENNESSEE v. RODNEY STEPHENS

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Campbell County**
**No. 15070      E. Shayne Sexton, Judge**

_____

**No. E2014-02514-SC-R11-CD – Filed June 16, 2017**

_____

We granted the State's application for permission to appeal in this case in order to determine whether the Court of Criminal Appeals erred in concluding that the evidence was not sufficient to support the Defendant's conviction of aggravated stalking. The Court of Criminal Appeals reduced the Defendant's conviction to misdemeanor stalking after concluding that the State had not adduced sufficient evidence to establish that the Defendant knowingly violated an order of protection. We hold that the Court of Criminal Appeals misapplied the standard of review and so committed reversible error. Because the proof was sufficient to support the jury's determination that the Defendant had actual knowledge of the order of protection issued against him on August 20, 2010, the evidence is sufficient to support the Defendant's conviction of aggravated stalking. Accordingly, we reverse the judgment of the Court of Criminal Appeals and reinstate the trial court's judgment.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Criminal Appeals Reversed;
### Judgment of the Trial Court Reinstated

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, and ROGER A. PAGE, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Andrew C. Coulam, Assistant Attorney General; William Paul Phillips, District Attorney General; and Leif E. Jeffers, Assistant District Attorney General, for the appellant, the State of Tennessee.

Michael G. Hatmaker, Jacksboro, Tennessee, for the appellee, Rodney Stephens.

# OPINION

## Factual and Procedural Background

The Defendant, Rodney Stephens, was charged with one count of domestic assault and one count of aggravated stalking. A jury acquitted the Defendant of the domestic assault charge and convicted him of the aggravated stalking charge. The trial court sentenced the Defendant to two years of incarceration, suspended to three years of probation after sixty days of confinement. The Defendant appealed, and the Court of Criminal Appeals concluded that the evidence was insufficient to support his conviction. State v. Stephens, No. E2014-02514-CCA-R3-CD, 2016 WL 81386, at *10 (Tenn. Crim. App. Jan. 6, 2016).[1] Accordingly, the Court of Criminal Appeals reduced the Defendant's felony conviction to the misdemeanor conviction of stalking. Id. We granted the State's application for permission to appeal in order to determine whether the Court of Criminal Appeals erred in concluding that the evidence was not sufficient to support the Defendant's conviction of aggravated stalking.

At the Defendant's jury trial, Jessica Stephens testified that she and the Defendant married in 2004 and had two children together. On the evening of August 19, 2010, the Defendant accosted her in her car as she was parked waiting to pick up a pizza. According to Ms. Stephens, the Defendant banged on the driver's side window, jerked open the car door, and physically assaulted her. When the headlights of another vehicle illuminated them, the Defendant backed away and she was able to close her door and drive away. Ms. Stephens called the police and drove to a gas station. The Defendant also drove to the gas station and verbally accosted Ms. Stephens inside the store. The police arrived shortly thereafter, arrested the Defendant, and took the Defendant to jail.[2]

The next morning, August 20, 2010, Ms. Stephens obtained an order of protection against the Defendant. Later that morning, she received a phone call from the Sheriff's Department notifying her that the Defendant had been released. Ms. Stephens testified that, during the phone call, she was told that the Defendant "had been served with his order of protection." Ms. Stephens identified a nine-page collection of documents that contained a two-page application for an order of protection, a five-page document titled "Petition for Orders of Protection" ("the Petition"), and a two-page document titled "Ex Parte Order of Protection" ("the Order of Protection"). This collection of documents was admitted into evidence as a single exhibit ("the Exhibit"). The Petition indicates that it was personally served on the Defendant "on 20th, 2010 [sic] at 10:10 a.m." by David Goin. The Order of Protection was signed by a judge and was issued on August 20, 2010. The Order of Protection provides, *inter alia*, that the Defendant "shall not commit

---

[1] One judge dissented from this conclusion. Stephens, 2016 WL 81386, at *10 (Easter, J., dissenting).

[2] This is the conduct that formed the basis of the domestic assault charge.

2

or threaten to commit abuse, domestic abuse, stalking or sexual assault against [Ms. Stephens] or [Ms. Stephens'] minor children" and that the Defendant "shall not telephone, contact, or otherwise communicate with [Ms. Stephens], directly or indirectly." The "Return of Service" section of the Order of Protection is blank.

Later during the day of August 20, 2010, Ms. Stephens and the Defendant had another encounter. She testified that, as she was driving with her father to the residence she shared with the Defendant, she passed the Defendant and the Defendant's mother "coming from the house." When the two cars passed each other going in opposite directions, the car in which the Defendant was riding "stopped and turned around in the road and started following" the car that Ms. Stephens was in. The Defendant's mother was driving the other car, and the other car "actually attempted to block [her] in" at a church. Ms. Stephens called the police, and the police arrived and arrested the Defendant. She did not remember if the Defendant got out of the car during their encounter.

Around the first of September 2010, Ms. Stephens was in the Verizon store paying her bill when she heard a "banging noise." When she turned to see the source of the noise, she saw the Defendant "walking and hitting the window . . . telling [her] to come outside." Ms. Stephens remained in the store. She stated that the Defendant's actions scared her. The police arrived and arrested the Defendant.

Later in September 2010, after Ms. Stephens had moved to a different residence, she saw the Defendant driving up and down the road in front of her house. Ms. Stephens and her daughter were in the front yard. She stated that the Defendant "cuss[ed]" at her, "flipped [her] off," and yelled at her daughter that "he was gonna get her." Ms. Stephens took her daughter into the house. She saw the Defendant drive around "one or two more times." After she no longer saw him, she left to drive to her grandmother's house. As she was pulling into a gas station, she saw the Defendant behind her. The Defendant circled her vehicle and then stopped "[o]n the other side" of the gas station. Ms. Stephens called 911 and "took off."

Ms. Stephens added that, while she was at the gas station, the Defendant called her cell phone from a number she did not recognize. When she answered, the Defendant told her that he was going to hurt her and that she would "pay for this." Ms. Stephens emphasized that she was afraid of the Defendant.

Dustin Leper testified that he assisted Ms. Stephens in the Verizon store where he worked in September 2010. He recalled someone motioning at the window from outside for Ms. Stephens to come outside and that Ms. Stephens became very nervous. Mr. Leper noticed that Ms. Stephens' hands were shaking badly. Mr. Leper called 911 and the police arrived and arrested the person who had motioned to Ms. Stephens.

Jeffrey McMann testified that he began dating Ms. Stephens in late September or early October 2010.  He knew the Defendant only as Ms. Stephens' ex-husband.

Deputy Ken Daugherty of the Campbell County Sheriff's Department responded to the August 20 incident involving the Defendant's riding in his mother's car.  Deputy Daugherty testified that he asked the Defendant "if he had his order of protection with him."  According to Deputy Daugherty, the Defendant "actually had the paperwork with him" and showed it to the deputy.  The prosecutor then handed Deputy Daugherty the Exhibit and asked him if he had "seen that document before."  Deputy Daugherty responded, "It does look familiar to me, but one of my primary jobs is to serve orders of protection."  Asked if the Defendant had denied knowing about the Order of Protection, Deputy Daugherty stated, "He didn't."  Nor, according to Deputy Daugherty, did the Defendant "act surprised to find it in his . . . possession."

The Defendant testified and acknowledged that he approached Ms. Stephens as she sat in her car near the pizza parlor on August 19, 2010.  He stated that he spoke with her through the car window, which was partially down.  He stated that he did not open the car door and that he did not touch Ms. Stephens.  When she called the police, he left.  When he later pulled into the Exxon, he saw her car.  He went into the store and called her a liar.  He was subsequently arrested and taken to jail for the night.  Asked if he was "served with a petition for order of protection while [he was] in jail," the Defendant testified, "I really don't know if I was.  I believe I was served with a—something.  I was served with some—I don't know.  Yeah, I don't know if it's an actual order of protection or what it was, but I was served with something."

The next day (August 20), his mother came and made his bail, and he left with her.  She drove him to his residence because he thought his truck had been towed there.  When he learned that his truck was not at his residence, they turned around and headed back toward town.  As they were driving back toward town, they passed Ms. Stephens and Mr. McMann driving together in Mr. McMann's truck.[3]  The Defendant stated that he was calling the police trying to locate his truck.  The police arrived and arrested him and took him back to jail.

The Defendant testified that he filed for divorce from Ms. Stephens on August 24, 2010.

---

[3] Ms. Stephens' and the Defendant's testimony differed on whom Ms. Stephens was riding with on this occasion.

The Defendant stated that, on September 1, 2010, he pulled into the Verizon parking lot where he saw Mr. McMann. The Defendant stated that he did not see Ms. Stephens in the store and that he "went to approach to talk to Jeff McMann." He and Mr. McMann "had an exchange of words" outside the store in the parking lot for several minutes. The Defendant did not see Ms. Stephens until she came out of the store after the police arrived.

The Defendant testified that, beginning on September 20, 2010, he was in Alabama working. He stated that he did not know where Ms. Stephens was living at that time. He remained in Alabama "a few months" working.

On cross-examination, the Defendant denied banging on the windows at the Verizon store.

Also during cross-examination, the following colloquy took place:

Q. And you knew when you left the jail [on August 20, 2010] that there was an order telling you not to have any contact with your wife, right?

A. When I left the jail?

Q. Right.

A. Yeah.

Q. When you left out of the [sic] here on August the 20th, you knew about this order, right? Somebody had served that on you and gave you a copy of it even, right?

A. Uh-huh (yes).

Q. In fact, you had it with you a few minutes later when the officer stopped you?

A. Yes, sir.

Q. And told him about it and showed it to him?

A. Yes, sir.

. . . .

5

Q. And you're not here—you're not trying to tell the folks on this jury that you didn't know that you were not allowed to have contact with [Ms. Stephens], right? I mean, I just want to make—you knew that there was an order of protection, right?

A. Yes, sir.

On the basis of this proof, the jury acquitted the Defendant of domestic assault and convicted him of aggravated stalking. The Defendant appealed, asserting that the proof was not sufficient to support his aggravated stalking conviction. The Court of Criminal Appeals agreed. The State timely filed its application for permission to appeal, which we granted in order to determine whether the Court of Criminal Appeals erred in reducing the Defendant's conviction from aggravated stalking to misdemeanor stalking on the basis of insufficient evidence.

## Standard of Review

Our standard for reviewing the sufficiency of the evidence underlying a criminal conviction is well-established. First, we examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense. See, e.g., State v. Smith, 436 S.W.3d 751, 761–65 (Tenn. 2014) (conducting statutory interpretation of offense's elements before conducting sufficiency review). Next, we analyze all of the evidence admitted at trial in order to determine whether each of the elements is supported by adequate proof. See, e.g., id. at 764-65. In conducting this analysis, our inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings of guilt . . . beyond a reasonable doubt.").

After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Consequently, the defendant has the burden on appeal of demonstrating why the evidence is insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We, as an appellate court, do not weigh the evidence anew. Evans, 838 S.W.2d at 191. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. This "standard of review 'is the same whether the

6

conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

## Analysis

The crime of aggravated stalking is defined as follows:

> A person commits aggravated stalking who commits the offense of stalking as prohibited by subsection (b), and . . . [a]t the time of the offense, was prohibited from making contact with the victim under a restraining order or injunction for protection, an order of protection, or any other court-imposed prohibition of conduct toward the victim or the victim's property, *and the person knowingly violates the injunction, order or court-imposed prohibition.*

Tenn. Code Ann. § 39-17-315(c)(1)(E) (2010) (emphasis added). It is the final statutory element, whether the Defendant "knowingly" violated the Order of Protection, that is at issue in this case.

The offense of stalking set forth in the referenced subsection (b), in turn, is defined as follows: "A person commits an offense who intentionally engages in stalking." Id. § 39-17-315(b)(1). The statutory term "stalking"

> means a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested, and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested[.]

Id. § 39-17-315(a)(4). The statutory term "course of conduct" "means a pattern of conduct composed of a series of two (2) or more separate noncontinuous acts evidencing a continuity of purpose." Id. § 39-17-315(a)(1). The statutory term "harassment"

> means conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable person to suffer emotional distress, and that actually causes the victim to suffer emotional distress. Harassment does not include constitutionally protected activity or conduct that serves a legitimate purpose[.]

Id. § 39-17-315(a)(3). And, the statutory term "emotional distress" "means significant mental suffering or distress that may, but does not necessarily, require medical or other

7

professional treatment or counseling." Id. § 39-17-315(a)(2). Finally, the statutory term "knowingly" is defined as follows:

> "Knowing" refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Id. § 39-11-302(b) (2010).

Assessing the evidence before it in light of these statutes, the Court of Criminal Appeals initially held as follows:

> The relevant time period for the aggravated stalking count is August 20 to September 26, 2010. Viewed in the light most favorable to the State, the evidence shows that the Defendant repeatedly engaged in conduct that would cause a reasonable person to be terrorized, frightened, intimidated, threatened, or harassed and that Ms. Stephens was actually terrorized, frightened, intimidated, threatened, or harassed. A short period of time after the Defendant was released from jail on August 20, he was a passenger in a car driven by his mother which turned around to follow Ms. Stephens, who testified that the car in which the Defendant rode attempted to block her. On September 1, the Defendant went to a Verizon store where Ms. Stephens was a customer, banged on a window, and yelled and gestured for her [to] come outside. On September 26, the Defendant repeatedly drove past Ms. Stephens's house, made threats and an obscene gesture, called her repeatedly and threatened to hurt her, and circled around the convenience store to which she went after the Defendant's conduct at her house. Regarding the Defendant's intent, the record reflects that he knew when he was released from jail on August 20 that the victim had attempted to obtain an order of protection prohibiting him from contacting her. The record also reflects that on August 20, the Defendant showed Deputy Daugherty a document relevant to the order of protection. These facts show the Defendant's knowledge of Ms. Stephens's desire not to have any contact with him and, thereby, his intent to engage in conduct that constituted the offense of stalking.

Stephens, 2016 WL 81386, at *8. We agree with this analysis of the evidence.

However, the Court of Criminal Appeals then determined that the evidence was not sufficient to demonstrate that the Defendant knowingly violated the Order of Protection so as to elevate the stalking offense to aggravated stalking:

8

The Ex Parte Order of Protection itself does not reflect that the Defendant was aware of the order's existence and its contents. The Petition for Orders of Protection reflects service on the Defendant by Officer Goin, who did not testify. Although Deputy Daugherty testified that the Defendant had a copy of an order of protection, Deputy Daugherty's identification of the document the Defendant showed him was not precise. We cannot determine from the record before us whether Deputy Daugherty identified the Petition for Orders of Protection or the Ex Parte Order of Protection, both of which were included in the exhibit he was shown. The Defendant's testimony supports a conclusion that he was given a document at the jail, but he did not know what the document was. He said this document was the same one he showed Deputy Daugherty later that day. We acknowledge that the Defendant affirmed on cross-examination that he was aware on August 20 of an order of protection.

Resolving the question of whether the Defendant was actually aware of the order of protection is essential to determining whether the Defendant possessed a knowing mens rea to violate the order. We are troubled by the multi-document exhibit, the record's lack of clarity relative to Deputy Daugherty's identification of which document the Defendant showed him; the exhibit showing on its certificate of service that the document the Defendant received was the Petition for Orders of Protection, not the Ex Parte Order of Protection; and the Defendant's testimony that he showed Deputy Daugherty the same document on August 20 that the Defendant had received earlier that day at the jail.

Upon review, we conclude that a rational trier of fact could not conclude beyond a reasonable doubt that the Defendant possessed the culpable mental state of knowingly violating an order of protection. Although the record contains evidence the Defendant knew about the Ex Parte Order of Protection, the record also contains evidence the only document served on the Defendant was the Petition for Orders of Protection. Even when viewed in the light most favorable to the State, the evidence does not establish beyond a reasonable doubt that the Defendant knowingly violated the order. For this reason, the Defendant's conviction of aggravated stalking by knowingly violating an order of protection was improper.

Id. at *9–10. One member of the court's panel dissented from this conclusion. Id. at *10 (Easter, J., dissenting).

In our view, the majority of the Court of Criminal Appeals panel erred by reweighing the evidence rather than properly applying the standard of review. This Court recently reiterated "the distinction between assessing the weight of the evidence and assessing the sufficiency of the evidence." State v. Ellis, 453 S.W.3d 889, 898 (Tenn. 2015). We recognized that

> "[d]ifferent considerations are present in each. In evaluating the legal sufficiency of the evidence, the judge determines whether all the necessary elements of the offense have been made out, whether the defendant's identity has been established and whether the proof demonstrates the existence of a valid defense. In doing so, the court is required to view the evidence in the light most favorable to the verdict, giving the prosecution the benefit of all inferences reasonably to be drawn from the evidence . . . ."

Id. at 899 (quoting State v. Johnson, 692 S.W.2d 412, 415 (Tenn. 1985) (Drowota, J., dissenting)).

In contrast to an appellate court's review of the sufficiency of the evidence after judgment has been entered, a *trial* court assesses the *weight* of the evidence before it enters judgment on a jury verdict of guilt. See State v. Moats, 906 S.W.2d 431, 433 (Tenn. 1995) (recognizing that "in a criminal case 'it is the duty of the trial judge to consider the weight of the evidence and determine whether or not it establishes . . . guilt beyond a reasonable doubt'") (quoting Manning v. State, 292 S.W. 451, 457 (Tenn. 1927)). In this respect, the trial judge is acting as the "thirteenth juror," id., and has the authority to "grant a new trial . . . if it disagrees with the jury about the weight of the evidence," Tenn. R. Crim. P. 33(d). The reasons underlying the thirteenth juror rule are well-established:

> "the circuit judge hears the testimony, just as the jury does, sees the witnesses, and observes their demeanor upon the witness stand; that, by his training and experience in the weighing of testimony, and the application of legal rules thereto, he is especially qualified for the correction of any errors into which the jury by inexperience may have fallen, whereby they have failed, in their verdict, to reach the justice and right of the case, under the testimony and the charge of the court; that, in our system, this is one of the functions the circuit judge possesses and should exercise—as it were, that of a thirteenth juror. So it is said that he must be satisfied, as well as the jury; that it is his duty to weigh the evidence, and, if he is dissatisfied with the verdict of the jury, he should set it aside."

Moats, 906 S.W.2d at 433 (quoting Cumberland Tel. & Tel. Co. v. Smithwick, 79 S.W. 803, 804 (Tenn. 1904)).

As we recognized in Ellis,

> "An inquiry into the *weight* of the evidence is entirely different [from an assessment of its sufficiency]. The trial judge does not have to view the evidence in the light most favorable to the prosecution; he may weigh the evidence himself as if he were a juror and determine for himself the credibility of the witnesses and the preponderance of the evidence. As the Eighth Circuit stated in United States v. Lincoln, 630 F.2d 1313 (8th Cir. 1980), even if the trial judge concludes that 'despite the abstract sufficiency of the evidence to sustain the verdict, [that] the evidence preponderates sufficiently heavily against the verdict that a serious miscarriage of justice may have occurred, [he] may set aside the verdict, grant a new trial, and submit the issues for determination by another jury.' Id. at 1319."

Ellis, 453 S.W.3d at 899 (quoting Johnson, 692 S.W.2d at 415 (Drowota, J., dissenting)) (first alteration added). The trial judge is in a position to weigh the evidence because he or she was present for the testimony and so had an opportunity to determine credibility. A trial judge's position is in stark contrast to an appellate judge's, whose review of the case is limited to the cold written record of the trial. Indeed, "[a]ppellate courts are ill-suited . . . to assess whether the verdict is supported by the weight and credibility of the evidence." Moats, 906 S.W.2d at 435.

The Court of Criminal Appeals in this case listed all of the pieces of proof relevant to the Defendant's knowledge of the Order of Protection and became "troubled" by the ambiguity surrounding the Exhibit (because it contained multiple documents), Officer Daugherty's testimony, and the fact that there was no return of service noted on the Order of Protection. However, as the Court of Criminal Appeals specifically noted, the Defendant himself testified that he had been given a copy of the Order of Protection when he left the jail on August 20 and that he "knew that there was an order of protection." The Defendant also acknowledged that he knew he was prohibited from having any contact with Ms. Stephens. The Court of Criminal Appeals' conclusion that this testimony was inadequate to support the "knowingly violated" element of the offense resulted from the court's inappropriate *comparison* of some ambiguous proof with the Defendant's own specific admission that he knew about the Order of Protection and its contents. In so doing, the Court of Criminal Appeals committed reversible error.

Additionally, the majority decision by the intermediate appellate court could be construed as requiring the State to prove a completed return of service notation on an order of protection, or to adduce testimony from the serving officer, in order to establish the crime of aggravated stalking. The crime of aggravated stalking does not require proof that the order of protection was technically served on the defendant. The crime of aggravated stalking requires only that the defendant "knowingly violate[d]" the order of

11

protection.  The trier of fact may find that a defendant has knowingly violated an order of protection when the State adduces sufficient proof to establish, beyond a reasonable doubt, that the defendant had actual knowledge of the order and that his conduct is in violation of the order.  No proof that the order has been technically served on the defendant is necessary to establish this element of the crime.[4]

We hold that, viewed in the light most favorable to the State, the Defendant's specific testimony that he knew about the Order of Protection and that it prohibited him from having contact with Ms. Stephens was legally sufficient to support the jury's determination that the Defendant knowingly violated the Order of Protection, regardless of any ambiguity surrounding other aspects of the State's proof on this issue. Accordingly, we hold that the evidence is sufficient to support the Defendant's conviction of aggravated stalking.[5]

## Conclusion

We reverse the judgment of the Court of Criminal Appeals that reduced the Defendant's conviction to misdemeanor stalking and reinstate the trial court's judgment of conviction designating the Defendant guilty of one count of aggravated stalking.

_____
JEFFREY S. BIVINS, CHIEF JUSTICE

---

[4] However, when the prosecution has proof that an order of protection was served on the defendant, such proof would be helpful to the trier of fact.

[5] Because we hold that the proof is sufficient to support the jury's conclusion that the Defendant had actual knowledge of the Order of Protection, we need not address the State's argument that the aggravated stalking statute requires only constructive notice.