IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 5, 2017

## STATE OF TENNESSEE v. CORBYN DAVIS

**Appeal from the Circuit Court for Madison County**
**No. 16-204   Donald H. Allen, Judge**

_____

## No. W2017-00141-CCA-R3-CD

_____

A Madison County jury convicted the Defendant, Corbyn Davis, of first degree premeditated murder and being a convicted felon in possession of a firearm. The trial court sentenced the Defendant to life in prison for the murder conviction and to four years for the firearm conviction. On appeal, the Defendant challenges the sufficiency of the evidence to support each conviction. Upon reviewing the record and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

George Morton Googe, District Public Defender; Gregory D. Gookin, Assistant Public Defender, for the appellant, Corbyn Davis.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Jody Pickens, District Attorney General; and Aaron J. Chaplin and Shaun Brown, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The evidence presented at trial established that in the early morning hours of June 8, 2014, the victim, Mr. Jamar Rogers, was shot from behind while getting into an occupied vehicle in a parking lot outside a night club ("the night club") located by the

Omni Center in Jackson, Tennessee. The victim was rushed to the hospital but died as a result of a single gunshot wound to his back.

**The State's Proof**

Ms. Marlisa Smith testified that she was the fiancée of the victim and was with him at the time of the shooting. On the night of the shooting, Ms. Smith went to the night club with Ms. Brittney Wilson, Ms. Krystal Williams, and another woman identified as "Jenna" to meet the victim and one of the victim's friends. Ms. Smith stated that she arrived with the other women around midnight and that the victim arrived at the same time. The group stayed at the club for about three hours until Ms. Smith's friends decided they wanted to leave. Ms. Smith, the three friends with whom she arrived, and the victim all exited the club and began walking toward the vehicle the women had driven to the club. Video surveillance confirmed that Ms. Wilson, Ms. Williams, and "Jenna" left the club at 2:55 a.m. and that Ms. Smith and the victim left the club approximately forty-five seconds later. Ms. Smith stated that her three friends were walking about ten feet in front of Ms. Smith and the victim.

Ms. Smith stated that as she and the victim were walking toward the vehicle and as the other three friends were getting inside the vehicle, a man approached the victim and Ms. Smith. She stated that the man was wearing "a khaki or a yellowish Polo hat" with a matching shirt. The man said, "What's up, Jamar?" to the victim and attempted to shake the victim's hand. The victim looked at the man as if he was "shock[ed] that [the man] was speaking," and the victim "just walked through him." Ms. Smith and the victim then continued to the vehicle. By this time, the other three friends were already seated in the vehicle, and Ms. Smith got into the middle of the backseat. Ms. Smith said, "Come on, Jamar," but the victim stood next to the car looking into the window. The victim said he was going to go back inside and then said, "Never mind." The victim was opening the door when Ms. Smith heard three to four gunshots. The victim said, "Bae, I'm hit." The victim leaned on Ms. Smith, so she grabbed him, laid him down, and started performing CPR as Ms. Wilson drove the vehicle to the hospital. Ms. Smith stated that she was "screaming and hollering" both when she arrived at the hospital with the victim and when an officer took her statement.

Ms. Smith stated that immediately after hearing the gunshots, she saw another car leaving the area down a road that ran adjacent to the parking lot and behind the parked vehicle. She described the car as a brown or tan large vehicle, similar to a "Grand Marquis." She could determine the car's make by its headlights and taillights. The vehicle in which Ms. Smith was sitting when the shooting occurred had a shattered rear windshield as a result of the shooting.

Ms. Smith testified that although she had never seen the man who approached them prior to the night of the shooting, she found a picture of the Defendant the following day on Facebook. The picture showed the Defendant sitting with another man, whom she did not recognize, on top of a car that fit Ms. Smith's description of the car she saw leaving the area immediately after the shooting occurred. She stated that she recognized the Defendant in the picture as the man who approached them that night because she would "never forget that face." Ms. Smith also identified the Defendant in court as the man who approached her and the victim prior to the shooting.

On cross examination, Ms. Smith acknowledged that she had two to three mixed drinks that night and that she was "at least pretty buzzed." She stated that the victim had not been drinking and that she was not aware of any drug use by the victim that night. She further acknowledged that when giving a statement to police at the hospital, she did not tell the police about the man who approached them prior to the shooting. She told police in her initial statement that she did not see a car leaving the scene. Ms. Smith said that at the time of the questioning, however, she was "panicked." She also acknowledged that she was never shown a photographic lineup by the police to identify the man who approached them prior to the shooting. However, Ms. Smith maintained that she was certain that the Defendant was the man who approached them.

Ms. Brittney Wilson testified that she had gone with Ms. Smith, Ms. Williams, and "Jenna" to the night club. Ms. Wilson drove the group in her own vehicle and backed it into a parking spot, with the rear end of the vehicle toward the road. She testified that she did not see the Defendant approach the victim and Ms. Smith when they were leaving the club. Ms. Wilson did see Ms. Smith get into the backseat of the vehicle. Ms. Wilson had turned to look at her phone when she heard three or four gunshots coming from behind the vehicle. She turned around and saw that the victim had been hit, and that the rear windshield had been shattered. Ms. Wilson said that the victim "fell" into the backseat of the vehicle and Ms. Wilson drove to the hospital.

Ms. Wilson testified consistently with Ms. Smith's testimony that when she turned around after hearing the gunshots, she saw a vehicle driving on the road behind her car. Ms. Wilson described the car as a beige or tan "Grand Marquis or Crown Vic," based on the style of the car. She described the damage to her own vehicle as a shattered rear windshield, blood in the backseat, and a bullet hole in the backside of the vehicle. On cross examination, Ms. Wilson stated that she did not have anything to drink that night but that the other women had "[m]aybe a drink or two."

Officer Curtis Patrick Cozart of the Jackson Police Department ("JPD") testified that he was at the hospital when the women arrived with the victim. Officer Cozart stated that he tried to keep the occupants of the vehicle calm but that they were "very, very,

very upset." Officer Cozart identified photographs of the shattered windshield of Ms. Wilson's vehicle, specifically noting where a round was shot through the windshield.

Officer Wesley Smith of the JPD testified that he responded to a call for a loud noise disturbance around 3:10 a.m. and was stopped by several individuals who said that shots had been fired at the Omni Center. He searched the area and found two shell casings on the road where Ms. Wilson and Ms. Smith testified seeing a car driving immediately after the shooting had occurred.

Mr. Demarcus Triplett testified that he was with the Defendant on the night of the shooting. He stated that the Defendant was driving a "[g]ray Crown Vic or Marquis" that belonged to the Defendant's girlfriend. Mr. Triplett viewed the picture Ms. Smith found on Facebook and identified the car in the picture as the one that they were in on the night of the shooting. The Defendant picked up Mr. Triplett from work around midnight and drove him home to change clothes. They then met Mr. Josh Cobb at a different club located on North Parkway. The three men then went to the night club. They parked the car and sat in the parking lot for a few minutes until another man, whom Mr. Triplett did not know, got into the car with them. Mr. Triplett stated that the unidentified man was drunk and immediately fell asleep in the backseat of the car. While they were in the car, Mr. Triplett smoked marijuana with Mr. Cobb and the Defendant. Mr. Triplett testified that he did not feel intoxicated, that he could remember what happened that night, and that he was not drinking alcohol. The Defendant then asked Mr. Triplett to take the drunk man home. The Defendant and Mr. Cobb got out of the car, and Mr. Triplett then left the parking lot and started to drive the drunk man home. Mr. Triplett was unable to wake the drunk man to find out where the man lived, however, so he turned around and went back to the parking lot of the club. Mr. Triplett estimated that he was gone for fifteen to twenty minutes. He parked the car when he returned, and Mr. Cobb and the Defendant got back into the vehicle.

When the group decided to leave, Mr. Triplett drove the car in a circle through the parking lot again and then pulled out onto the street that ran behind the parking lot. The Defendant then told Mr. Triplett to stop the car, and Mr. Triplett did so. The Defendant got out and walked around the car back to the parking lot. Mr. Triplett saw the victim and two females walking through the parking lot and heard the Defendant say, "What's up, Jamar?" Mr. Triplett then saw the Defendant raising a black and silver weapon in the air. Mr. Triplett turned his head away from the Defendant, and about five to seven seconds later, Mr. Triplett heard a gunshot. Mr. Cobb encouraged Mr. Triplett to leave without the Defendant. Mr. Triplett put the car into gear but the Defendant was already running back around the car before Mr. Triplett could drive away. The Defendant got back into the car and said, "Just drive." Mr. Triplett drove the car in a direction that was consistent with the testimony of Ms. Smith and Ms. Wilson. He drove the car to a

friend's house in an area called the "Backwoods," and Mr. Cobb, the Defendant, and the drunk man drove away in the car, leaving Mr. Triplett at his friend's house.

Mr. Triplett described the weapon with which he saw the Defendant that night as a "small gun" like a "[.]25 automatic." He stated that he did not see that gun again until he and the Defendant were robbed "a couple of weeks" later. Mr. Triplett stated that he and the Defendant were in a car together with another man identified as "Fanbo" and that they drove to an area where about thirty individuals were standing. Mr. Triplett stated that he did not know if there was a meeting occurring or if it was a setup. "Fanbo" and the Defendant got out of the car and walked to the group of people. Mr. Triplett then got out of the car and was patted down by Mr. Lewis Dotson. Mr. Dotson took Mr. Triplett's cellular phone and a couple of dollars from him. The group also took approximately $200 and a gun from the Defendant. Mr. Triplett stated that the gun appeared to be the same gun he saw the Defendant waving in the air on the night of the shooting. At trial, Mr. Triplett was shown a picture of a Bryco pistol that was later introduced into evidence. He stated that the gun in the picture looked like the gun that the Defendant had the night of the shooting and that Mr. Dotson took from the Defendant the day of the robbery.

Mr. Triplett testified that he did not see the Defendant again after the robbery occurred. He did not go to the police after the shooting or after the robbery. He stated that he was "scared" and that everyone he knew who had previously testified in a trial "end[ed] up getting killed afterwards." Mr. Triplett only spoke to police about the shooting after he was arrested for an unrelated offense in January, 2016. Mr. Triplett stated that no promises were made to him by the State in exchange for his testimony.

On cross examination, Mr. Triplett acknowledged that he never reported the robbery to the police. When asked why his initial statement to the police was that Mr. Cobb joined them while they were at the night club, Mr. Triplett explained that there must have been a typo when the investigator entered the report because Mr. Cobb joined the group when they were still at the Parkway club. Mr. Triplett also stated that he was afraid of guns and did not like guns but acknowledged that he had one previous gun charge. He also identified pictures of himself posted on a social media website under the name "Rashad Woods." The pictures showed Mr. Triplett holding a gun with the caption, "Hit me up if you want to buy it." Mr. Triplett testified that after speaking to the police about the Defendant's involvement in the shooting, Mr. Triplett received unsupervised probation for driving on a suspended license. Mr. Triplett was not charged in connection with the shooting.

Mr. Matthew Price testified that he was incarcerated with the Defendant from December of 2015 to March of 2016. Mr. Price stated that he interacted with the

Defendant every day and described the Defendant as "pretty shaky." He stated that the Defendant "wouldn't give specifics at first" regarding his charges but that the Defendant became more specific over time. Mr. Price testified that the Defendant would ask questions "like how long can a camera keep video," "can you find fingerprints on spent shells," and "can they get DNA off a gun." Mr. Price said that the Defendant also asked Mr. Price to look up first degree murder in the law books for him. Mr. Price testified, "[W]ithout coming out and telling me, … [the Defendant] kind of told me that … he had shot somebody at a club." Mr. Price could not recall the name of the person whom the Defendant shot. Mr. Price stated that the Defendant told him that after the shooting, the Defendant got into a vehicle and "drove to the woods or Back Woods or something along those lines." Mr. Price testified that when the Defendant spoke about the shooting, he did so "discre[et]ly," in that he would not say the word "kill." Instead, the Defendant would spell or whisper the word. The Defendant also told Mr. Price that at some point another person was arrested with the same gun that the Defendant had used and that the Defendant's questions about DNA evidence then followed.

Mr. Price testified that around March of 2016, he and the Defendant were both in city court. The Defendant was there for his preliminary hearing and Mr. Price was there for a drug possession case that was pending at the time. Mr. Price said they saw the driver of the vehicle in which the Defendant was riding on the day of the shooting. The driver testified at the Defendant's preliminary hearing, and the Defendant told Mr. Price that the driver was not credible, that the driver was there when the shooting occurred, and that the driver was "just as guilty as [the Defendant] was." Mr. Price testified that prior to the Defendant's preliminary hearing, Mr. Price had submitted "numerous request forms" to talk to the police about the Defendant's case. After getting no response, Mr. Price was able to talk to the police the day of the hearing by "flagging" down investigators. Mr. Price testified that he was no longer being held in the same pod as the Defendant at the time of the hearing.

On cross examination, Mr. Price acknowledged that he was serving three years on probation for a previous felony conviction at the time of the trial. He also acknowledged that he was arrested again for failure to report to the probation office and that the court ordered him to rehabilitation rather than revoking his probation. Mr. Price claimed that receiving rehabilitation rather than revocation was not connected to the statements he gave to the police about the Defendant. He agreed that at the time of trial, he still had pending charges. Mr. Price also claimed that what defense counsel described as a "low bond" of $5,000 was not related to his statements to the police. He testified that he did not have an agreement with the State in exchange for his testimony, but that he was getting "consideration" for his testimony. Mr. Price also noted that at the time he spoke with the police, he had not spoken to anyone about receiving any consideration.

- 6 -

Further evidence introduced by the State established that on August 15, 2014, a search warrant was executed on a residence with eight to ten members of the Vice Lords street gang inside of it at the time. While searching the residence, law enforcement found a .25 caliber Bryco pistol in a bathtub, with one round inside of it. Investigator Kelly Schrotberger, of the JPD Gang Enforcement Team, was familiar with the Vice Lords street gang and interviewed the members who were inside the residence. He testified that Mr. Lewis Dotson and Mr. William Curry-Anthony were two of the individuals in the residence at the time. No one was charged with possession of the Bryco pistol that was found.

Dr. Erin Carney, a medical examiner who performed an autopsy on the victim, testified that the victim had a gunshot wound on the left side of his back. Dr. Carney stated that the bullet had injured one of his ribs, went through his lung, and entered his pulmonary vein. The blood in the vein then carried the bullet into the victim's heart, and the bullet was retrieved from the victim's heart during the autopsy. Dr. Carney concluded from the wound that the gun was more than two or three feet away from the skin when it was fired, but she could not determine how much further away it was. She testified that the cause of death was the gunshot wound to the back and that the manner of death was homicide. She stated that death would not have been instantaneous but would have taken "seconds to minutes." Dr. Carney stated that in her opinion, the victim would have been able to enter a car and say that he had been shot and that the victim might have survived a three-mile drive to the hospital.

Special Agent Samantha Spencer, a forensic scientist with the Tennessee Bureau of Investigation ("TBI") DNA and Serology Unit, testified that she performed DNA analysis on the Bryco pistol. Special Agent Spencer used standards obtained from the individuals who were in the residence where the gun was found, including Mr. Dotson and Mr. Curry-Anthony, to determine if their DNA was present on the Bryco pistol. She was unable to obtain a DNA profile from the pistol due to insufficient or degraded DNA.

Special Agent Eric Warren, a forensic scientist with the TBI Firearms Identification Unit, testified that he examined the two shell casings that were found on the road where the shooting occurred. He determined that the two shell casings were fired from the same unknown firearm. He analyzed the Bryco pistol and determined that there were similar class characteristics between the pistol and the shell casings but that the mechanical fingerprint was insufficient to conclude that the shell casings had in fact been fired from the Bryco pistol. Special Agent Warren also examined the bullet that was retrieved from the victim's heart and concluded that the bullet had been fired from the Bryco pistol.

**Defense Proof**

Mr. William Curry-Anthony testified that he was in the residence that was searched in August, 2014. He testified that the police confiscated the Bryco pistol and that he told the police that his name was "Anthony Williams." He also told the police that he found the gun in an alley in Humboldt. In July of 2015, Mr. Curry-Anthony gave the police a second statement and said that he actually purchased the gun from "D. Triplett" in July of 2015 for approximately $50. When giving this second statement, Mr. Curry-Anthony identified two photographs of Mr. Demarcus Triplett as the person from whom he purchased the pistol.

On cross examination, Mr. Curry-Anthony initially denied being a member of the Vice Lords street gang, but later acknowledged his membership after the State questioned him about the tattoo on his face. Mr. Curry-Anthony acknowledged that all except one of the other individuals in the residence on the day of the search were members of the Vice Lords gang. He acknowledged that he made his initial statement to the police after he had been in jail for a week with the other gang members who were arrested. He claimed, however, that they did not speak to each other about their pending cases. The State then asked, "And then what happened was, you guys split up the guns to the non-felons; right?" Mr. Curry-Anthony answered, "Right," but then maintained that he would not lie for Mr. Dotson, who was another gang member in the residence at the time of the search. Mr. Curry-Anthony also agreed that since he was not a convicted felon, it was not illegal for him to have possession of the pistol. He further acknowledged that he had had a probation violation at the time in addition to the pending charges that resulted from the search of the residence. Mr. Curry-Anthony acknowledged that he lied about his name and about how he obtained the pistol in his initial statement to the police. He maintained at trial that he actually received the gun by buying it from Mr. Triplett. He stated that Mr. Triplett arrived in a car with another person, whom Mr. Curry-Anthony would not identify, and that Mr. Triplett then sold the pistol to Mr. Curry-Anthony.

The defense introduced evidence to establish that Mr. Price was incarcerated with the Defendant from December 7, 2015, until January 5, 2016, whereas Mr. Price had testified that he was with the Defendant from December of 2015 to March of 2016. The defense also introduced a consent form into evidence, which showed that the Defendant had given consent to the State to obtain his DNA sample. However, the Defendant's DNA was not used as a standard when Special Agent Spencer conducted the DNA analysis on the Bryco pistol.

The jury returned verdicts of guilty for Count 1, first degree premeditated murder, and Count 2, being a convicted felon in possession of a firearm. The Defendant received

consecutive sentences of life in prison on Count 1 and four years in prison on Count 2. The Defendant's timely appeal followed.

## ANALYSIS

The Defendant challenges the sufficiency of the evidence to support his convictions. When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted). The court determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). "'[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Id.* (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). This court does not reweigh the evidence. *Id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Instead, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75) (internal quotations omitted). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982))

First degree murder is the "premeditated and intentional killing of another." T.C.A. § 39-13-202(a)(1). Conduct is intentional when the actor has the "conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). A premeditated act is one "done after the exercise of reflection and judgment." T.C.A. § 39-13-202(d). Premeditation requires a finding that "the intent to kill must have been formed prior to the act itself." *Id.* "It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* The statute also specifies that "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* Factors that support a finding of premeditation include but are not limited to: the use of a deadly

weapon upon an unarmed victim; the particularly cruelty of the killing; the nature of the killing; the firing of multiple shots; evidence establishing motive; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; lack of provocation by the victim; failure to render aid; preparations before the killing for concealment of the crime; the destruction or secretion of evidence; and calmness immediately after the killing. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013); *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013); *State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001).

Tennessee Code Annotated section 39-17-1307(b)(1)(B) makes it an offense to be convicted of a felony drug offense and possess a firearm. Firearm is defined as "any weapon designed, made or adapted to expel a projectile by the action of an explosive or any device readily convertible to that use." T.C.A. § 39-11-106(a)(11).

The Defendant argues that the evidence was insufficient to support his convictions because the testimony from Mr. Triplett and Mr. Price was not credible and because the remaining evidence was circumstantial. The Defendant specifically maintains that the State failed to show motive for the killing and that there was no physical or DNA evidence that linked the Defendant to the Bryco pistol.

When viewed in the light most favorable to the State, the proof established that the Defendant attempted to speak to the victim by saying, "What's up, Jamar?" moments before the victim was shot. Two witnesses testified to seeing a car leaving the crime scene, and their descriptions of the car matched that in which the Defendant was riding the night of the shooting. Ms. Smith identified a photograph of the Defendant as the man who approached Ms. Smith and the Defendant moments before the shooting occurred. The driver of the car, Mr. Triplett, testified that the Defendant shot the victim. Although Mr. Triplett did not see the Defendant pull the trigger, he saw the Defendant approach the victim, wave a pistol in the air, and run back to the car immediately after shots were fired. Mr. Triplett further testified that he and the Defendant were robbed by Mr. Dotson, who took the Defendant's pistol. Later testimony established that Mr. Dotson was in the Vice Lords street gang and was inside a residence with other gang members when the Bryco pistol was found by law enforcement. A TBI expert testified that the shell casings found at the crime scene had similar characteristics to test shots fired from the Bryco pistol. Additionally, the expert concluded that the bullet that was retrieved from the victim's heart had in fact been fired from the pistol found at the residence. Mr. Triplett's testimony was corroborated by the testimony of Mr. Price. Mr. Price testified that the Defendant spoke to him about the shooting while they were incarcerated together. The Defendant asked incriminating questions to Mr. Price and essentially confessed his involvement in the shooting. Mr. Price knew that the Defendant had shot someone outside of a club, that the Defendant then got into a car, and that they drove to an area

described as the "woods or Back Woods," which was consistent with Mr. Triplett's testimony.

The jury's finding of premeditation was supported by the evidence presented at trial. The victim was unarmed when he was killed. *See Bland*, 958 S.W.2d at 660. The Defendant did not render aid and immediately fled the scene after firing shots at the victim. *See Larkin*, 443 S.W.3d at 815-16. According to eyewitness testimony, three to four shots were fired without any provocation from the victim. *See id.*; *Halake*, 102 S.W.3d at 669. The evidence also established that the victim was shot in the back. *See State v. Joe Edward Daniels*, No. M2015-01939-CCA-R3-CD, 2017 WL 1032743, at *8 (Tenn. Crim. App. Mar. 16, 2017) (noting that a shot from behind is sufficient to support a finding of premeditation). Thus, the State met its burden in establishing premeditation.

As noted above, the jury's guilty verdict, approved by the trial court, accredits the testimony of the State's witnesses and resolves all conflicts in favor of the State. *Stephens*, 521 S.W.3d at 724. The rationale behind this rule is that "[t]he trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand." *Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966). Here, the jury heard the testimony of both Mr. Triplett and Mr. Price, as well as the evidence presented by the defense in an effort to discredit their testimony. By returning guilty verdicts, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's assessment of credibility. *See State v. Carruthers*, 35 S.W.3d 516, 558 (Tenn. 2000).

Additionally, "a criminal offense may be established exclusively by circumstantial evidence." *Dorantes*, 331 S.W.2d at 379 (citing *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973); *Marable v. State*, 313 S.W.2d 451, 456-58 (Tenn. 1958)). Here, physical evidence established that the bullet that killed the victim was shot from the Bryco pistol. Witness testimony established that the Bryco pistol was consistent with the one the Defendant had on the night of the shooting, that was taken from the Defendant by Mr. Dotson, and that was found in the residence with Mr. Dotson. The Defendant points to the fact that Mr. Curry-Anthony claimed ownership of the pistol. Although the testimony of Mr. Curry-Anthony regarding how he obtained the pistol was inconsistent with the testimony of Mr. Triplett, the jury heard the testimony of each witness and settled the conflict in favor of Mr. Triplett by returning guilty verdicts. *See Stephens*, 521 S.W.3d at 724.

We also note that although the Defendant argues that the State failed to show motive for the killing, motive is not an essential element of first degree premeditated murder that must be proven by the State. *See State v. Bell*, 512 S.W.3d 167, 191 (Tenn. 2015) (noting that motive is not an element of first degree murder).

- 11 -

## CONCLUSION

Based on the foregoing reasons, we conclude that the evidence was sufficient to support the convictions and affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE