IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs July 18, 2018

## STATE OF TENNESSEE v. CLAUDE DELANORE MANEY, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2013-C-2654    Cheryl A. Blackburn, Judge**

_____

### No. M2017-01711-CCA-R3-CD

_____

The Defendant, Claude Delanore Maney, Jr., was convicted by a jury of aggravated assault by strangulation and was sentenced as a Range II, multiple offender to eight years of incarceration. On appeal, the Defendant challenges the sufficiency of the evidence to support his conviction. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Jay Umerley (on appeal); Nicholas McGregor (at hearing); Loren Pardue and Ed Hastings (at trial), Nashville, Tennessee, for the appellant, Claude Delanore Maney, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Glenn Funk, District Attorney General; and Leandra Varney, Lauren Spero and Sara Beth Myers, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

Following an altercation with his girlfriend, the Defendant was charged with aggravated assault by strangulation, false imprisonment, and coercion of a witness. A judgment of acquittal was entered for the coercion of a witness charge following the State's case-in-chief, and the jury found the Defendant guilty of aggravated assault by strangulation and not guilty of false imprisonment.

On the evening of February 16, 2013, Ms. Megan Taylor, the victim, was four months pregnant and at the Defendant's apartment with the Defendant and the Defendant's friend. The Defendant and the victim had recently become romantically involved, and the Defendant was aware of the victim's pregnancy. The Defendant had planned to take the victim home at 9:00 p.m., but the victim decided she wanted to leave earlier. The Defendant became upset, and they began to argue. The Defendant grabbed the victim by the arm and pulled her onto a bed in the living room. When the victim got up to leave again, the Defendant "grabbed [her] by [her] neck" and laid her on the bed. The Defendant told the victim that she could not leave. He then threw the victim off the bed and onto the floor, causing her to land on the right side of her face. While the victim was on the floor, the Defendant took the victim's cellular telephone and photo identification out of her purse. The victim testified that she did not see where the Defendant placed the two items. The Defendant later told the victim that she could leave. When she tried to do so, he changed his mind, and they began to argue. The Defendant pushed her down again. The victim did not recall whether the Defendant was verbally threatening her during the encounter. The Defendant's friend was sitting in the living room during the incident but did not become involved.

At some point, the victim and the Defendant went into a bedroom and continued to argue. After about five minutes, the Defendant fell asleep. The victim walked into the living room, where the Defendant's friend was still sitting. She asked the friend whether it was dark outside, and as she opened the door to check, she ran out the door. She ran to another apartment building and began knocking on doors for help.

Ms. Luella Boyd lived in one of the apartments and allowed the victim to use her telephone to call 9-1-1. She testified that the victim "was upset and crying."

An audio recording of the victim's 9-1-1 call was admitted into evidence. The victim told the operator that the Defendant was her ex-boyfriend and that he was trying to kill her. She said the Defendant became angry with her when she wanted to leave his apartment and took her cellular telephone. She stated that the Defendant had hit her, thrown her on a bed, and "choked [her] out." She explained that she ran as soon as the Defendant fell asleep and that her head and jaw were injured. She reported that the Defendant said the victim "would be the next Tabitha Tudors [sic]" and that she would not be going home.

Officer Jeremy Smith of the Metro Nashville Police Department was one of the officers who responded to the victim's 9-1-1 call. When he arrived on the scene, the victim was acting "erratically" and was "very hysterical." Once the officers calmed the victim, she stated that she had gotten into an argument with her boyfriend, that he would not allow her to leave his apartment, and that "he grabbed her around the throat and

began to strangle her." She also stated that she had either fallen or was pushed, causing her to hit her head on the floor.

Officer Smith observed red marks on the victim's neck, which he believed "looked like a handprint around her neck." He could not determine whether there were one or two handprints, but he stated "it was very, very apparent that there were marks around her neck." He considered the marks consistent with that of a person who was strangled. The victim reported to Officer Smith that she had trouble breathing and that she believed "she had lost consciousness for a minute." Officer Smith did not recall whether the victim's voice was raspy but did recall that she was "yelling and screaming" in a "very high pitched voice" when he arrived on the scene.

After speaking with the victim, Officer Smith and another officer went to the Defendant's apartment. The Defendant allowed the officers inside and agreed to speak with them. The Defendant's friend stated that he did not know what had occurred because he was asleep. The Defendant initially said he was asleep, as well, and that he had merely gotten into an argument with the victim. Officer Smith testified that the Defendant later "tr[ied] to say it wasn't that serious or it wasn't a big deal." Officer Smith did not recall whether the Defendant had any injuries. He described the Defendant as calm and appearing as though he had just awoken.

Detective John Timm of Metro Nashville Police Department's Domestic Violence Division visited the victim while she was in the emergency room. He observed "a couple of marks on her neck, a gash on the top of her forehead, and … a mark or something on one of her fingers."

Photographs of the victim's injuries were taken by Detective Timm while at the hospital and were entered into evidence. The victim viewed the photographs and identified a knot on her head and red marks on her neck, including a red mark that looked like a thumbprint. She testified that she received treatment for her injuries, that her baby was not injured, and that her jaw was "cracked" from where she was thrown from the bed to the floor. At the time of trial, she was still having issues with her cracked jaw.

The victim testified that she did not have trouble breathing when the Defendant was choking her. She explained that the Defendant was not squeezing her neck but was merely holding the front of her throat. She denied losing consciousness at any point. When asked what she meant when she told the 9-1-1 operator that the Defendant "choked [her] out," the victim explained that she meant he was choking her.

The victim also testified that she had been contacted by a woman identified only as "Pam," who offered the victim $300 if she would not appear for court. The victim

identified "Pam's" voice and the Defendant's voice in a recording of a telephone call made by the Defendant while he was in jail. During the conversation, the Defendant said that the victim "cannot come to court." He asked "Pam" to tell the victim that he apologized and that he did not remember the night of the incident well. He instructed "Pam" to offer to pay the victim not to appear in court.

On cross-examination, the victim testified that she and the Defendant were pushing each other back and forth and yelling at each other during the incident. She did not recall how long she was choked by the Defendant. She agreed that it would be "safe to say" that she testified at the preliminary hearing that she was choked for five to ten seconds. She then later agreed that she testified at the preliminary hearing that she was choked for one minute. She acknowledged that she said the Defendant was not her boyfriend at the preliminary hearing. She explained that she was angry during the hearing. She stated that she did not recall whether she was threatened regarding her testimony. She agreed that she had not spoken with the Defendant since the night of the offense.

A judgment of acquittal was entered for the coercion of a witness charge, and the defense offered no additional proof. The jury found the Defendant guilty of aggravated assault by strangulation and not guilty of false imprisonment. After a subsequent sentencing hearing, the Defendant was sentenced as a Range II, multiple offender to eight years for the aggravated assault conviction. The sentence was to run concurrently with a prior sentence in a separate case. The Defendant now appeals.[1]

## ANALYSIS

The Defendant's sole issue on appeal is the sufficiency of the evidence to support his conviction. He argues that the State did not meet its burden of showing strangulation because the victim testified at trial that the Defendant did not squeeze her neck, that she did not have trouble breathing, and that she did not lose consciousness. The State responds that the evidence is sufficient, and we agree.

---

[1] A delayed appeal was granted in this case on October 28, 2015. The Defendant's motion for a new trial was filed on August 7, 2017, and was denied on August 25, 2017. The Defendant's notice of appeal was filed August 29, 2017. The State filed a motion to dismiss on the ground that the notice of appeal was not timely filed. This court ordered that the notice be deemed timely and left open the question of whether the motion for a new trial was timely. Because the only issue on appeal is sufficiency of the evidence, which need not be raised in a motion for a new trial to be preserved on appeal, we need not determine the timeliness of the motion for a new trial. *See* Tenn. R. App. P. 3(e).

When a defendant challenges the sufficiency of the evidence, this court must determine whether the evidence is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). The appellate court examines the relevant statute to determine the essential elements for the offense and analyzes the evidence admitted at trial to determine whether each element is adequately supported. *State v. Stephens*, 521 S.W.3d 718, 723-24 (Tenn. 2017) (citations omitted). The court determines "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The standard of review remains the same regardless of whether the conviction is based upon direct or circumstantial evidence. *Id.* (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)). "'[T]he State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom.'" *Id.* (quoting *State v. Harris*, 839 S.W.2d 54, 75 (1992)). This court does not reweigh the evidence. *Id.* (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)). Instead, "'a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts' in the testimony in favor of the State." *Id.* (quoting *Harris*, 839 S.W.2d at 75). The conviction replaces the presumption of innocence with a presumption of guilt. *Id.* (citing *Evans*, 838 S.W.2d at 191). On appeal, the defendant has the burden of demonstrating why the evidence is insufficient to support the verdict. *Id.* (citing *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982)).

As charged against the Defendant, aggravated assault occurs when a person "[i]ntentionally or knowingly commits an assault" and "[a]ttempts or intends to cause bodily injury to another by strangulation." T.C.A. § 39-13-102(a)(1)(A)(iii) (2012 Supp.). Assault occurs when a person "[i]ntentionally, knowingly or recklessly causes bodily injury to another." T.C.A. § 39-13-101(a)(1) (2010). Strangulation occurs by "intentionally impeding normal breathing or circulation of the blood by applying pressure to the throat or neck or by blocking the nose and mouth of another person." T.C.A. § 39-13-102(a)(2) (2012 Supp.).

The Defendant argues that the victim's testimony at trial does not establish that strangulation occurred. Viewed in the light most favorable to the State, the victim testified that the Defendant put his hand around the front of her neck and choked her. Although the victim stated at trial that her breathing was not affected and that the Defendant did not squeeze her neck, she told Officer Smith at the scene that she had

trouble breathing and had lost consciousness.[2]  She also told the 9-1-1 operator that the Defendant had "choked [her] out."  Photographic evidence showed red marks around the victim's neck.  The victim identified a red mark that looked like a thumbprint, and Officer Smith testified that the victim had a handprint around her neck, which he stated was consistent with someone who had been strangled.  Based on this evidence, a rational jury could find strangulation beyond a reasonable doubt.  *See State v. Roderick Williams*, No. W2015-00832-CCA-R3-CD, 2016 WL 7664769, at *4 (Tenn. Crim. App. May 5, 2016) (holding the evidence was sufficient to support an assault conviction where an officer testified about his observations of the victim's injuries, even though the victim denied any recollection of the defendant's hitting her), *perm. app. denied* (Tenn. Sept. 23, 2016).  The Defendant is accordingly denied relief.

## CONCLUSION

Based on the foregoing, the judgment of the trial court is affirmed.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

---

[2] The Defendant notes in his brief that this statement was "inadmissible hearsay."  He acknowledges that no objection was made during the trial, and he does not include the admission of the statement as a separate issue on appeal nor as a separate ground for relief.  To the extent that he is arguing the trial court erred in admitting the statement, this issue is waived for failure to object contemporaneously.  *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party … who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").