IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs June 8, 2022

**STATE OF TENNESSEE v. JERRY LOUIS FITZGERALD, Jr.**

**Appeal from the Circuit Court for Gibson County**
**No. H9775     Clayburn Peeples, Judge**
_____

**No. W2021-00195-CCA-R3-CD**
_____

The Defendant, Jerry Louis Fitzgerald, Jr., was convicted at trial of sexual battery and possession of 0.5 grams or more of cocaine with the intent to sell or deliver, and he received an effective sentence of fourteen years in confinement.  On appeal, the Defendant argues that the evidence was insufficient to convict him of sexual battery and that although he possessed the cocaine, the evidence was insufficient to support a finding that he intended to sell or deliver it.  After review, we affirm the trial court's judgments.

**Tenn. R. App P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Harold E. Dorsey, Trenton, Tennessee, for the appellant, Jerry Louis Fitzgerald, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Frederick Hardy Agee, District Attorney General; and Jason Scott and Jennifer McEwen, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The Defendant was arrested in a Hardee's drive-thru after the victim reported to law enforcement that he raped her at knifepoint on June 27, 2015.  Law enforcement searched the Defendant's vehicle pursuant to a search warrant and discovered 0.81 grams of crack cocaine.  The Defendant was indicted for one count each of aggravated rape,

aggravated kidnapping, and possession of 0.5 grams or more of cocaine with intent to sell or deliver.

*The State's Proof*

At trial, the victim testified that she visited Ms. Bernita Green's home along with her husband and children on June 26, 2015. There, she met the Defendant, whom she only knew as "Buck," for the first time. The victim and her family eventually went home, but Ms. Green called the victim the same day and invited her "to go back out." The victim accepted the invitation and told Ms. Green that she would walk to her house because they lived close by. However, Ms. Green suggested, "Just have Buck come get you." The victim called the Defendant, and the Defendant picked her up around midnight in his vehicle. She entered the Defendant's vehicle, and the Defendant drove the victim to an unknown trailer in Humboldt, Tennessee, to "pick up some liquor." They arrived at the trailer and walked to a back bedroom. The Defendant allowed the victim to enter the room first and told the victim to pick up some alcohol that was in the bedroom. However, when she turned around, the Defendant wielded a blue-handled knife and would not let her exit the room. The victim stated that the Defendant held the knife to her throat and started pulling down her shorts. She explained that in response she told him no and that she wanted to leave. The Defendant slapped her, grabbed her, "knocked [her] everywhere," and ripped her shirt. The Defendant pushed her onto the bed and tried to pour liquor down her throat, knocking her tooth out with the bottle in the process. He also tried to make the victim snort white powder and eventually poured it down her throat. Meanwhile, the victim repeatedly told the Defendant she did not want to be there. She stated that the Defendant raped her vaginally for an hour and a half or two hours. She stated that she sustained bruises on her wrist and thighs during the attack. At trial, the victim identified the shorts and shirt she wore on the day she was raped. The collar on the shirt was torn from the Defendant's yanking and twisting it, and her shorts were torn as well.

The Defendant and the victim left the trailer and entered the Defendant's vehicle. At some point when the victim exited the trailer, she called 911 on her cell phone and placed the phone in her bra facing outward for the dispatcher to listen to what was occurring. The Defendant started driving but did not take the victim home. Instead, the Defendant stated that he was hungry, drove to Hardee's, and started ordering food. The victim observed law enforcement across the street, and after the Defendant also observed law enforcement, he told the victim to conceal drugs wrapped in a brown piece of paper in her vagina. The victim responded, "I'm not going to do it." She said that law enforcement officers approached the vehicle and that she exited the vehicle and ran to them. She reported to law enforcement that the Defendant raped her and was transported by ambulance to the hospital.

An audio recording of the victim's 911 call was played for the jury at trial. The victim identified her voice in the recording and identified the male voice as the Defendant. Although the audio recording is not part of the appellate record, a transcript of the recording was entered as an exhibit at trial. According to the transcript, parts of the call were unintelligible. However, intelligible parts of the transcript reflect that the victim complained to the Defendant that he had "just beat [her], and beat her," narrated that they were "in Hardee's now" as she tried to order something, and questioned, "Are you putting that in my [vagina]? No!" The Defendant stated, "Spread the [vagina]." The victim then requested help from someone and reported that the Defendant took her "to some . . . drug house" and raped her. The call ended shortly after.

A nurse examined the victim at the hospital and collected the victim's clothes and a vaginal swab as evidence. The victim stated that her vagina was bruised and was hurting badly. She denied that the nurse asked her to take a drug test but stated that the nurse requested a blood sample. Being afraid of needles, the victim declined to provide a blood sample, but she provided a urine sample. She denied that she left the hospital before being released. She said that Sergeant Kevin Hill visited her in the hospital and that she tried to explain what occurred but "all of it wouldn't come out at that moment." She stated that she had knots on the top of her head and that her face was red from the Defendant's striking her. She agreed that she provided a video-recorded statement to Sergeant Hill two days after the rape occurred but that the injuries were not visible in that video. She stated that she was not using drugs at the time of the rape and did not know what drugs would have been detected in her system at that time.

The victim stated that she had been living in Humboldt for approximately two years and that the rape occurred in Humboldt. However, she did not know where the trailer was located other than that it was located "over the tracks." She did not drive around or ride with police to look for the trailer in which the rape occurred. She disagreed that she was in a sexual relationship with the Defendant and stated that the only sexual encounter they had was against her will. She agreed that the Defendant told her that she owed him money and that he screamed at her demanding money, but she did not owe the Defendant money. She denied that she had previously exchanged sex for drugs.

Humboldt Police Department (HPD) Officer Derek Austin Way testified that at approximately 3:57 a.m. on June 27, 2015, he received a call regarding a possible domestic assault in progress. The dispatcher did not provide him with an active location of the caller, but he had a location of "somewhere on North Fourth Avenue." In response to the call, Officer Way, Officer Daniel Jones, Officer Tony Barr, and Sergeant Roy Hudson responded to the North Fourth Avenue area and began searching for anything that related to the reported disturbance. Initially, Officer Way did not have a description of the persons or vehicle involved. However, at some point he was notified to look for a

- 3 -

vehicle at the Plaza Shopping Mall near Hardee's. After observing vehicles at Hardee's and communicating with the dispatcher, Officer Way and the other officers decided to approach a black sedan because it was the only vehicle that had two passengers in it. Officer Way blocked the vehicle's exit by parking his patrol car in front of the vehicle. As soon as Officer Way stopped his vehicle, the victim exited the black sedan and ran to Officer Way's location screaming, "Help me, help me." Officer Way stated that the victim appeared to be under extreme duress, was breathing frantically, shaking, rushed, and "[h]er eyes were dilated as if something had occurred." She told Officer Way, "Get me out of here. Get me out of here," and Officer Way escorted her to enter the back of his patrol car while Officers Jones and Barr made contact with the Defendant. The victim told Officer Way, "He raped me. He raped me. And he has a knife." Officer Way advised the other officers that there was a weapon present and to detain the Defendant.

Officer Barr moved Defendant's vehicle from the drive-thru line to the front of Hardee's to allow other vehicles parked behind it to exit. Before the vehicle was towed, Officer Way conducted an inventory search of the vehicle to document the vehicle's model, the location of the vehicle, and any valuable items contained inside visible in plain view. In the vehicle, Officer Way documented finding a cell phone, a baseball cap, various CDs, and a small backpack in plain view. Afterward, Sergeant Hill managed the investigation. On cross-examination, Officer Way stated that Officers Jones and Barr informed him no knife was found on the Defendant's person. Officer Way did not observe a knife in plain view during his inventory of the vehicle's contents. He denied that the victim appeared to be "high" based on her dilated eyes. Officer Way agreed he did not have any knowledge of what had occurred before he encountered the victim. He agreed that no drugs were found during his inventory search of the Defendant's vehicle but stated that in order to allow Sergeant Hill to search the vehicle for evidence, he only looked for items in plain view without moving anything.

Officer Daniel Jones worked for the HPD on June 27, 2015, and encountered the Defendant as the driver of the black sedan from which the victim fled. He stated that he transported the Defendant to the police department but that he did not know what happened to the vehicle when he left. On cross-examination, Officer Jones did not recall if he found a knife on the Defendant's person. He did not find drugs on the Defendant's person, and he did not observe any physical injuries on the victim.

Ms. Tamara Bush, a Sexual Assault Nurse Examiner ("SANE"), treated the victim on June 27, 2015, at around 5:12 a.m. The victim reported to Ms. Bush that the Defendant took her to an unknown trailer, pulled a knife on her, tried to make her use drugs, and raped her. The victim reported having consensual sex with her husband but did not know when that occurred. Ms. Bush examined the victim's body to look for injuries. She noted that the victim had two bruises that were nickel-sized on her leg and

one bruise on her wrist that was about six centimeters in length. She also stated that when she conducted the vaginal examination, she noticed that the victim was "extremely tender" and appeared to be in pain during the examination. She stated that "[m]ost of the time you don't see injuries" but that "obviously you can tell when . . . somebody is hurting." She stated that she found a foreign pubic hair on the outside of the victim's vagina and collected it as evidence. Ms. Bush collected a saliva standard to obtain the victim's DNA, vaginal swabs, cervical swabs, a post void 4x4 used to wipe the victim after she urinated, the victim's shorts and shirt, and pubic hair combings as evidence. Afterward, law enforcement retrieved the evidence from the hospital.

Ms. Bush agreed she did not observe physical injuries to the victim's vagina, but she concluded there was an injury based on the victim's reactions to her examination. She said that based on her years of experience as a nurse, victims grimace when experiencing pain. She agreed that the victim could have acted like she was injured but stated that she did not think the victim was acting. She stated that "you normally don't" observe physical injuries to a victim's vagina and that "probably 90 percent of victims don't have visual vaginal injuries . . . because . . . the vagina is elastic." She agreed that "dryness" could be a cause of injury but stated that the body of a non-menopausal woman would self-lubricate regardless of whether the sex was consensual or not. She stated that the self-lubrication "makes it very difficult for victims because of that reason." She testified that the victim's injuries were consistent with those caused by rape. She stated that she provided the photographs of the victim's injuries to the police.

Ms. Bush denied trying to take a blood sample from the victim and stated that she does not draw blood. She noted in her records that "we weren't going to do a drug facilitated blood test." She agreed that she was able to conduct a complete examination and that the victim did not leave in the middle of the examination. On cross-examination, Ms. Bush stated that the victim refused to provide a blood sample or urine sample.

HPD Sergeant Kevin Hill testified that he visited the victim at the hospital, where he observed that she was covered with a blanket, appeared to be withdrawn, and was crying. The victim reported to Sergeant Hill that she and the Defendant visited a trailer and that, while inside, the Defendant held a knife to her throat and raped her. However, the victim did not know the location of the trailer. The victim stated that the knife had a hook on it and that once she and the Defendant left the trailer, she called 911. Sergeant Hill did not observe the victim's injuries at the time he interviewed her. The victim visited him for another interview the next week.

Sergeant Hill testified that he located the trailer in which the rape occurred on the west side of Humboldt, at an address on North Third Avenue. He did not search the trailer for evidence because he believed any evidence on scene would not be there

anymore. On cross-examination, Sergeant Hill agreed the victim could not identify the location of the rape except that she reported the trailer was "across the tracks," which "usually means it's on the west side" of town. He agreed he did not drive the victim around to look for the location. He agreed that law enforcement never recovered the knife.

The Defendant's vehicle was towed to an impound lot in Humboldt following the Defendant's arrest. During Sergeant Hill's investigation, the victim informed him that the Defendant tried to place drugs in her vagina and that the drugs were located somewhere in the vehicle if they were not found on the Defendant's person. Sergeant Hill obtained a search warrant for the vehicle, and he and Lieutenant Kenny Rich searched the vehicle on the Monday following the Defendant's arrest. Sergeant Hill found a piece of brown paper containing three rocks of crack cocaine weighing approximately 0.81 grams in total and a lighter under the driver's side floormat. Sergeant Hill photographed the interior and exterior of the vehicle. On cross-examination, he agreed that the amount of drugs was small and that there were no scales found in the vehicle. He also agreed that law enforcement did not find a large amount of cash on the Defendant's person at the time of the arrest, that no weapon was found on the Defendant's person or in the vehicle, and that no baggies were recovered. Sergeant Hill disagreed that the Defendant was a user rather than a dealer, but he agreed that none of the factors suggesting the Defendant was a dealer rather than a user were present.

Special Agent Donna Nelson of the Tennessee Bureau of Investigation ("TBI") tested the evidence collected from the victim at the hospital. She generated a DNA profile for the victim using the victim's saliva swab to compare it back to DNA found on other evidence samples. The victim's vaginal swab contained the presence of sperm. DNA testing of the swab indicated a mixture of DNA from two individuals, but the information was too limited to determine whose DNA was found on the swab. The victim's cervical swab contained the presence of semen but not sperm. DNA testing of the cervical swab indicated the presence of DNA, but the profile was too limited to determine whose DNA was found on the swab. The post void 4x4 swab contained the presence of sperm, and DNA testing of the swab indicated the presence of a mixture of DNA from three individuals. The Defendant's DNA matched the major contributor of DNA found on the swab. She could not determine who contributed to the minor profiles. Sperm was recovered from the victim's shorts, and the DNA testing showed a mixture of at least three individuals, with one male. The major contributor of DNA found on the shorts matched the major contributor of DNA found on the post void 4x4 swab. The Defendant's DNA matched the major contributor of the DNA profile found on the shorts. Special Agent Nelson stated that no semen was found on the victim's shirt and that no testing was conducted on the pubic hair. She stated that testing can detect the presence of sperm for three to five days after sexual contact, even if a victim had bathed between the

contact and the testing. She agreed that not all DNA is detectable for three to five days but stated that it commonly is detectable for three to five days.

Lieutenant Kenny Rich with the HPD Drug Task Force testified that he and Sergeant Hill seized crack cocaine from the Defendant's vehicle. Lieutenant Rich stated that the drugs were in the form of multiple rocks weighing 0.81 grams but that in his experience "the average user is going to buy half a gram." On cross-examination, Lieutenant Rich agreed that users of crack cocaine sometimes purchase more than one piece at a time but that "[i]t depends on the weight."

Ms. Lela Jackson, a forensic chemist with the TBI, testified that the crack cocaine submitted to her weighed 0.81 grams. She agreed that she did not weigh the paper towel in determining the weight of the drugs.

*The Defense's Proof*

Ms. Bernita Green testified that she knew the victim in June 2015 through Ms. Green's sister, Ms. Angela Champion, and eventually became friends with the victim. Ms. Green testified that the victim regularly used drugs, that the victim asked Ms. Green if she knew where to get drugs, and that the victim exchanged drugs for sex by asking if Ms. Green "had any friends that wanted to hook up with her." At some point, the victim and Ms. Green's neighbor posted advertisements on Craigslist relating to sex. She did not know when the victim made the posts but agreed it occurred "about that time frame when all this happened." She agreed she was friends with the Defendant and grew up with him but disagreed that she introduced the victim to him. She agreed that there were only about ten or twelve families on the west side of the railroad tracks in Humboldt. Ms. Green agreed that she had been previously convicted of introducing contraband into a county jail.

Mr. Darrell Walker testified that on the night the Defendant was arrested, Mr. Walker played cards and drank at his friend's trailer in Humboldt. When Mr. Walker arrived at the trailer, his friend told him that he had company. Approximately ten or fifteen minutes later, the Defendant and a woman emerged from the bedroom. The woman did not appear to be upset or in distress and asked Mr. Walker for a drink. The Defendant stated that he was going to get something to eat and that, "If you want a ride, I'll give you a ride." The Defendant and the woman left the trailer, and Mr. Walker learned that the Defendant was arrested at Hardee's minutes later. Mr. Walker stated that nobody was using drugs at the trailer that night and that he did not know if drugs were sold out of the trailer. He agreed that he had been convicted of felonies including aggravated assault, selling drugs, four counts of reckless endangerment with a deadly weapon, forgery, and writing bad checks.

Ms. Angela Champion testified that the victim had known the Defendant for a "couple" of months prior to the Defendant's arrest. She stated that she knew the victim was in a sexual relationship with the Defendant based on things the victim said. She explained that the victim "would come and talk to us and we knew because then she was hanging at my house." However, she agreed the victim did not tell her that she was in a sexual relationship with the Defendant. She believed that the victim used drugs at that time and agreed that it was not unusual for the victim "to go on binges of using drugs." On cross-examination, she agreed she was not at home when the Defendant picked up the victim and agreed she was not with the victim during the time that the victim alleged the rape occurred.

The jury found the Defendant guilty of sexual battery as a lesser included offense of aggravated rape and possession of 0.5 grams or more of cocaine with intent to sell or deliver but acquitted him of aggravated kidnapping. He received consecutive sentences of two years for sexual battery and twelve years for possession of 0.5 grams or more of cocaine with intent to sell or deliver for a total effective sentence of fourteen years. The Defendant appeals.

## ANALYSIS

The Defendant contends that the evidence was insufficient to support his convictions. We briefly note that Tennessee Rule of Appellate Procedure 27 lists the required contents of an appellant's brief. Absent from the Defendant's brief are the required table of authorities and an argument "with citations to authorities and appropriate references to the record relied on" as well as "a concise statement of the applicable standard of review." Tenn. R. App. P. 27(a)(2), (7). His argument section consists of only one page of argument and does not cite to a single authority to support his claims. These deficiencies ordinarily would render the Defendant's claims waived in their entirety. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). However, we elect to address the sufficiency issues raised by the Defendant despite the brief's deficiencies.

Reviewing the sufficiency of the evidence supporting a criminal conviction requires this court to first "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." *State v. Stephens*, 521 S.W.3d 718, 723 (Tenn. 2017). Next, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 724 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). If the evidence is insufficient to support the finding of guilt beyond a reasonable doubt, the finding of guilt "shall be set

aside." Tenn. R. App. P. 13(e). Once a defendant has been convicted, the presumption of innocence is replaced with a presumption of guilt on appeal. *Turner v. State*, 394 S.W.2d 635, 637 (Tenn. 1965). To overcome a presumption of guilt on appeal, the defendant bears the burden of showing the evidence presented at trial was "insufficient for a rational trier of fact to find guilt of the defendant beyond a reasonable doubt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982) (citing *State v. Patton*, 593 S.W.2d 913 (Tenn. 1979)).

On appeal, the State "is entitled to the strongest legitimate view of the trial evidence and all reasonable and legitimate inferences which may be drawn from the evidence." *State v. Evans*, 108 S.W.3d 231, 237 (Tenn. 2003) (citing *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999); *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This court may not reweigh or reevaluate the evidence, because "[q]uestions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *Id.* at 236 (citing *Bland*, 958 S.W.2d at 659). After a guilty verdict has been entered, the testimony of the State's witnesses is accredited, and all conflicts in the testimony are resolved in favor of the theory of the State. *State v. Nichols*, 24 S.W.3d 297, 301 (Tenn. 2000) (citing *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973)).

A defendant's guilt may be supported by direct evidence, circumstantial evidence, or a combination of both. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). Whether the evidence underlying the defendant's conviction at trial was direct or circumstantial, the same standard of review applies. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (citing *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

The Defendant argues the evidence was insufficient to support his conviction for sexual battery. "Sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim accompanied by any of the following circumstances:

(1) Force or coercion is used to accomplish the act;

(2) The sexual contact is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the contact that the victim did not consent;

(3) The defendant knows or has reason to know that the victim is mentally defective, mentally incapacitated or physically helpless; or

(4) The sexual contact is accomplished by fraud.

T.C.A. § 39-13-505(a) (2014), *amended by* 2021 Tennessee Laws Pub. Ch. 406 (eff. date July 1, 2021). "'[C]oercion' means the threat of kidnapping, extortion, force or violence to be performed immediately or in the future." *Id.* § 39-13-505(b) (2014).

Viewed in the light most favorable to the State, the Defendant picked up the victim at around 12:00 a.m. on June 27, 2020, and instead of driving to Ms. Green's home, he drove to a trailer located in Humboldt. According to the victim, she and the Defendant entered the trailer and went to the back bedroom, where the Defendant wielded a knife and prevented her from leaving. The victim testified that, over the course of an hour and a half or two hours, the Defendant beat the victim, tore her clothes, tried to force her to consume alcohol and a white, powdery substance, and raped her vaginally. The victim told him no and that she wanted to leave, but the Defendant continued his attack. Eventually, the Defendant and victim left the trailer, and the victim called 911 on her cell phone. After law enforcement approached the Defendant's vehicle at Hardee's, the victim fled the vehicle and reported to law enforcement that the Defendant raped her. The victim also reported to Ms. Bush that the Defendant raped her. During the victim's examination, Ms. Bush observed two nickel-sized bruises on the victim's leg and one bruise on her wrist that was about six centimeters in length. Ms. Bush testified that the victim "reacted in a painful way" and that the victim "was tender" during the vaginal examination, which she concluded was consistent with injuries associated with rape. The Defendant's DNA matched the major contributor for DNA found on the victim's post void 4x4 swab and her shorts. Although the Defendant attacked the credibility of the victim and other witnesses for the State at trial, the jury resolved questions of witness credibility in favor of the State's theory. *See Evans*, 108 S.W.3d at 237. The evidence was sufficient to show that the Defendant used force or coercion to accomplish sexual contact with the victim or that he had sexual contact with her without her consent.

Next, the Defendant argues that even though he possessed the crack cocaine found in his vehicle, the evidence was insufficient to show that he intended to sell or deliver it. "It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to. . . deliver or sell the controlled substance." T.C.A. § 39-17-417(a)(4) (2014). Cocaine is a Schedule II controlled substance. T.C.A. § 39-17-408(b)(4). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." T.C.A. § 39-11-302(a). "'Deliver' or 'delivery' means the actual, constructive, or attempted transfer from one person to another of a controlled substance . . . ." T.C.A. § 39-17-402(6). "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant

- 10 -

facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419; *but see State v. Belew*, 348 S.W.3d 186, 192 (Tenn. Crim. App. 2005) (concluding that possession of 2.2 grams of crack cocaine, without any other circumstances, was insufficient to support an inference of an intent to sell or deliver). Such "other relevant circumstances" that may support an inference of an intent to sell or deliver include the absence of drug paraphernalia, the weight, street value, and packaging of the drugs, and the presence of weapons. *See State v. Steven Kelly*, No. M2018-00659-CCA-R3-CD, 2019 WL 920361, at *4 (Tenn. Crim. App. Feb. 25, 2019) (distinguishing *Belew* and concluding that possession of 3.3 grams of crack cocaine in addition to the defendant's unemployment, testimony regarding the shape and value of the drugs, and the absence of drug paraphernalia supported an inference of intent to sell or deliver), *perm. app. denied* (Tenn. Apr. 11, 2019); *State v. Nelson*, 275 S.W.3d 851, 867 (Tenn. Crim. App. 2008) (concluding that the jury could reasonably infer that the defendant intended to sell the cocaine where an officer testified the amount of cocaine was not consistent with personal use, the defendant was spotted in a location known for illegal drug sales, no paraphernalia was found, and the defendant possessed $114 in cash and a check for an unspecified amount); *State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (concluding that the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell).

Viewed in the light most favorable to the State, the Defendant held the victim at knifepoint and tried to make her consume a white powder. The victim testified that he tried to make her snort the powder and then poured it down her throat after she refused to snort it. After leaving the trailer, the Defendant demanded money from the victim. He drove the victim to Hardee's, and in response to observing law enforcement nearby, he told the victim to conceal drugs contained in a brown piece of paper in her vagina. The Defendant was arrested and his vehicle was towed to an impound lot. Sergeant Hill and Lieutenant Rich found three rocks of crack cocaine weighing a total of 0.81 grams wrapped in a brown piece of paper and a lighter under the driver's side floormat in the Defendant's vehicle. Lieutenant Rich testified that "the average user is going to buy half a gram" but that the Defendant possessed 0.81 grams in the form of multiple rocks. No other items were seized from the Defendant's vehicle at the impound lot. Accordingly, the amount of drugs in addition to the Defendant's use of additional drugs and a knife to accomplish the sexual battery, his demanding money from the victim, his attempt to conceal the drugs in the victim's vagina, and the absence of drug paraphernalia provided the jury with a reasonable basis to infer that he possessed the crack cocaine with the intent to sell or deliver it. *See Steven Kelly*, 2019 WL 920361, at *4. Therefore, the evidence was sufficient to support the Defendant's conviction for possession of 0.5 grams or more of cocaine with intent to sell or deliver.

**CONCLUSION**

Based upon the foregoing reasons, we affirm the judgments of the trial court.

_____

JOHN EVERETT WILLIAMS, PRESIDING JUDGE