IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 14, 2025

## STATE OF TENNESSEE v. GARY ALLEN JORDAN, JR.

**Appeal from the Circuit Court for Madison County**
**No. 21-202    Joseph T. Howell, Judge**

_____

**No. W2024-00462-CCA-R3-CD**
_____

A Madison County jury convicted Defendant, Gary Allen Jordan, Jr., of fifty-five offenses, including charges of possession of methamphetamine with intent to sell or deliver, possession of cocaine with intent to sell or deliver, possession of heroin with intent to sell or deliver, possession of fentanyl with intent to sell or deliver, possession of marijuana with intent to sell or deliver, possession of a firearm by a convicted felon and possession of a firearm during the commission of a dangerous felony.  The trial court imposed an effective sentence of sixty-six years' confinement.  On appeal, Defendant contends that the trial court erred in denying his motion to suppress evidence seized during the search of his vehicle and that the evidence was insufficient to support his convictions related to the possession of cocaine and marijuana and the possession of a firearm.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

MATTHEW J. WILSON, J., delivered the opinion of the court, in which J. ROSS DYER and JOHN W. CAMPBELL, SR., JJ., joined.

William J. Milam, Jackson, Tennessee (at trial and on appeal) and David W. Camp, Jackson, Tennessee (at hearing) for the appellant, Gary Allen Jordan, Jr.

Jonathan Skrmetti, Attorney General and Reporter; Ronald L. Coleman, Senior Assistant Attorney General, and J. Katie Neff, Assistant Attorney General; Jody Pickens, District Attorney General; and Bradley Champine, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual and Procedural History**

On April 5, 2021, a Madison County Grand jury returned a fifty-seven-count indictment charging Defendant, Gary Allen Jordan, Jr., in fifty-five of the counts, as follows:

| Count 1 | Possession of 0.5 grams or more of methamphetamine with intent to sell |
|---|---|
| Count 2 | Possession of 0.5 grams or more of methamphetamine with intent to deliver |
| Count 3 | Possession of 0.5 grams or more of cocaine with intent to sell |
| Count 4 | Possession of 0.5 grams or more of cocaine with intent to deliver |
| Count 5 | Possession of 0.5 grams or more of heroin with intent to sell |
| Count 6 | Possession of 0.5 grams or more of heroin with intent to deliver |
| Count 7 | Possession of fentanyl with intent to sell |
| Count 8 | Possession of fentanyl with intent to deliver |
| Count 9 | Possession of not less than one-half ounce of marijuana with intent to sell |
| Count 10 | Possession of not less than one-half ounce of marijuana with intent to deliver |
| Count 11 | Possession of Suboxone |
| Counts 13-22 | Possession of a handgun (a forty-caliber Smith & Wesson M&P Shield) with intent to go armed during the commission of a dangerous felony |
| Counts 23-32 | Possession of a handgun (a forty-caliber Smith & Wesson SD40) with intent to go armed during the commission of a dangerous felony |
| Counts 33-36 | Violent felon in possession of a firearm |
| Counts 37-46 | Felon in possession of a firearm during the commission of a dangerous felony |
| Counts 47-56 | Possession of a firearm during the commission of a dangerous felony with a prior conviction for possession of a firearm during the commission of a dangerous felony |

Co-defendant Ashley Scruggs also was charged in Counts 1 through 11 and Counts 13 through 22. In Counts 12 and 57, co-defendant Scruggs was charged alone with possession of drug paraphernalia and criminal impersonation, respectively. The cases of Defendant and co-defendant Scruggs were severed prior to trial, and co-defendant Scruggs testified on behalf of the State at Defendant's trial. Defendant's bifurcated trial was held to allow the jury to determine whether Defendant had a qualifying prior felony conviction in Counts 37 through 56 as required by Tennessee Code Annotated section 39-17-1324(f).

Prior to trial, Defendant filed a motion to suppress evidence obtained as a result of a traffic stop by officers of the Jackson Police Department ("JPD"). Defendant argued that the traffic stop, and subsequent search of his vehicle were unconstitutional because officers did not have reasonable suspicion that a criminal offense had occurred to justify the stop and that the odor of marijuana alone was not sufficient probable cause to justify the search of Defendant's vehicle. The trial court conducted a hearing on the suppression motion on February 28, 2022. The trial court denied the suppression motion and entered an order which encompassed its findings on March 18, 2022. The trial court found that reasonable suspicion existed to conduct a traffic stop given the testimony "about the high crime rate in the area, drug trafficking, the time of day, [Defendant's] known criminal history, and the specific observations" by JPD officers. The court further found that probable cause existed to justify a search of Defendant's vehicle, "based on the totality of the circumstances and all the information [the arresting officer] already had plus the odor of marijuana coming from [Defendant's] vehicle."

Defendant filed a motion in the trial court for permission to seek an interlocutory appeal of the suppression order pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure. The trial court denied the motion. Defendant filed an application for a Rule 10 extraordinary appeal seeking interlocutory review of the suppression order, which this court denied. *See State v. Jordan*, No. W2022-00695-CCA-R3-R10 (Tenn. Crim. App. June 8, 2022), *perm. app. denied* (Tenn. Sept. 29, 2022). This court noted in its order that Defendant did not include a transcript of the suppression hearing as part of his application. Defendant then filed a Rule 11 application seeking permission to appeal to the Tennessee Supreme Court, which was denied. Defendant proceeded to trial in August 2023.

According to the evidence presented at trial, on the night of January 18, 2021, JPD Officer Deanna Morris was observing the Crestview Apartments remotely via police patrol cameras due to a "drug-trafficking problem" at the apartment complex. Through the patrol cameras, Officer Morris observed an unidentified female get out of the driver's seat of one vehicle and get into the back of another vehicle. Officer Morris regarded this behavior as "a little strange" and searched the license plate number of the vehicle that the female entered, and the registration returned to Defendant. By comparing the photograph of the driver's license associated with the registration to the police patrol camera footage, Officer Morris testified that she was able to confirm that the driver of the vehicle was Defendant.

Officer Morris testified that she observed Defendant "holding up two bags of what [she] believed to be marijuana, and the female picking which one she wanted to purchase." Once the female had the bag of marijuana, Officer Morris relayed information about the "narcotic activity" and Defendant's vehicle to officers for further investigation.

Special Agent Ryan Brisco of the 26th Judicial District Drug Task Force testified that he responded to the area of Crestview Apartments and saw a vehicle that matched Defendant's.[1]  Agent Brisco confirmed the license plate number was the same as that reported by Officer Morris, and he initiated a traffic stop.  Agent Brisco stated that he could smell a "strong odor of raw marijuana" emanating from the inside of Defendant's vehicle.  Agent Brisco acknowledged that hemp and marijuana smell the same, but he testified that given the nature of the hand-to-hand transaction that Officer Morris witnessed, it was not probable that the exchange was for a legal substance.  Agent Brisco asked Defendant to exit the vehicle.  As the front passenger, co-defendant Scruggs, and rear passenger, Rachel Fitzgerald, were exiting the vehicle, Agent Brisco observed a large plastic bag of marijuana on the rear floorboard of the vehicle with a smaller individually wrapped bag inside of it.  He also found a magnetic box located on the undercarriage of the vehicle.  In the magnetic box, he identified marijuana, methamphetamine, cocaine, heroin, fentanyl, and Suboxone strips.  Agent Brisco made these identifications based in part on his training and experience which included his work as a corrections officer for two years, a police officer for seven years, and over 600 hours of continuing education for law enforcement, the majority of which regarded narcotics enforcement and recognition.

The total weight of the marijuana that Agent Brisco found in the vehicle and magnetic box was fifty-four grams, which included the plastic bags in which it was stored.  He testified that according to his training and experience, the possession of a large amount of marijuana that is "packaged individually . . . it's always been indicative of someone that wants to sell the product.  He's already got it prepackaged, so he can make contact with a buyer, do the exchange, and then get out of the area quick."  The magnetic box also contained eleven baggies of methamphetamine weighing a total of 47.73 grams.  Agent Brisco explained the weight and individually packaged methamphetamine was indicative of it being packaged for resale.  Agent Brisco stated the mixture of heroin and fentanyl weighed 16.13 grams and the cocaine, which composed of a "bindle" and two small baggies, weighed 3.59 grams.

Officers further searched Defendant's vehicle.  In the seatback pocket of the front passenger's seat, Agent Brisco located a loaded .40 caliber Smith & Wesson M&P Shield.  A second loaded pistol, a .40 caliber Smith & Wesson SD40, was discovered wrapped in white rags under the hood of the vehicle.  Agent Brisco confirmed that Defendant had four prior convictions for aggravated robbery and was not legally allowed to possess a firearm.  Agent Brisco explained that based on his training and experience drug dealers carry firearms to "protect the product."

---

[1] At the time of Defendant's arrest, Special Agent Brisco was a JPD patrol officer.  He thereafter was employed as a Special Agent with the 26th Judicial Drug Task Force.

JPD Investigator Robert Pomeroy, an expert in narcotics investigations, further explained that it is common for robbers to target drug dealers because drug dealers are unlikely to call the police in response. He testified that as a result, "it's very common for us to find street-level and mid-level dealers that . . . have weapons to protect themselves, their product, and their currency." Investigator Pomeroy stated that he had spent eight years as a JPD patrol officer, four years in the narcotics division, and worked for the vice unit at the time of trial. He also had completed more than 300 hours of training focused on narcotics.

Officers found a plastic bag in the center console containing $2,500 in a variety of denominations. Next to the plastic bag was Defendant's wallet which contained numerous Cash App cards, a debit card, and an additional $1,600 to $1,700 in cash. Agent Brisco and Investigator Pomeroy both testified that based on their training and experience, locating a large amount of cash in multiple denominations meant it was likely the proceeds of a drug dealer's sales. Investigator Pomeroy stated that Cash App cards are commonly used for purchasing drugs. Also found in Defendant's wallet were four different hotel key cards. Investigator Pomeroy explained that drug dealers "jump from hotel to hotel" to avoid getting arrested by police or robbed. He further explained, "In a lot of the traffic stops and things we make, it's very common to find somebody who is dealing in narcotics, who will have a bunch of old discarded hotel room keys in their car."

While officers searched Defendant's vehicle, Defendant requested to speak with the on-call narcotics agent—Investigator Pomery. Defendant stated that he could help officers locate higher-level drug dealers in exchange for not going to jail that night. Investigator Pomeroy explained that JPD does not agree to release suspects in similar circumstances. Both Investigator Pomeroy and Agent Brisco agreed that based on their training, experience, and the evidence recovered from Defendant's vehicle, Defendant intended to sell the drugs.

Carter Depew, a Special Agent Forensic Scientist with the Tennessee Bureau of Investigation ("TBI"), testified that she tested some of the evidence recovered from Defendant's vehicle. Agent Depew confirmed Agent Brisco's identification of methamphetamine and the mixture of heroin and fentanyl. Due to the "high volume of drug cases" that the TBI handles, Agent Depew stated that she did not test the suspected cocaine or marijuana.

Rachel Fitzgerald, the rear passenger, testified that on the night that Defendant was arrested, he was driving her home after the vehicle that she was driving had broken down. Ms. Fitzgerald stated that they had been driving for approximately forty-five minutes to an hour before Defendant stopped at the Crestview Apartments. She recalled that Defendant made a couple of stops prior to arriving at the Crestview Apartments and made "some

transactions." She described the transactions as Defendant "meet[ing] up with somebody" and "talking and handing each other, you know, stuff, but I don't know exactly what it was." She agreed that a woman came up to Defendant's vehicle window at the Crestview Apartments, but she did not remember the woman getting in the vehicle.

Ms. Fitzgerald testified that when Agent Brisco initiated the traffic stop of Defendant's vehicle, she was in the back seat and that Defendant passed her a bag of marijuana and told her "To hide it and get rid of it." Ms. Fitzgerald stated that she placed it between her legs on the floorboard. Ms. Fitzgerald identified what Defendant passed her as marijuana because "I am an addict. I do recognize certain drugs, you know so, I knew it was quite an amount of weed. You know, it's obvious what it was." She conceded that her memory of the events could have been impaired because she used narcotics on the day of Defendant's arrest.

Co-defendant Scruggs testified that on the day of Defendant's arrest, the two were in an "off and on" relationship and that Defendant provided her with drugs. On the night of Defendant's arrest, he picked her up at a house where he "hid most of his drugs and guns." Co-defendant Scruggs stated that at the house, Defendant placed a black magnetic container underneath his car. She recalled observing Defendant sell "weed and meth" on the day of his arrest but agreed that her memory was affected by her consuming fentanyl that day. She stated that she, Defendant, and Ms. Fitzgerald smoked marijuana the night of Defendant's arrest. She said that as Defendant was being pulled over by the police, he moved his gun from the front seat to the passenger seatback pocket. She acknowledged that she initially provided police officers with a false name when first asked due to an outstanding warrant for her arrest.

Co-defendant Scruggs testified that sometime following Defendant's arrest, she overheard a conversation between Defendant and Jennifer Schuerenberg during which Defendant directed Ms. Schuerenberg to pick up the seized firearms from law enforcement because they were "in her name." Co-defendant Scruggs recalled that Ms. Schuerenberg told Defendant the request was futile, and "to drop it."

Jennifer Schuerenberg testified on behalf of Defendant. Ms. Schuerenberg testified that she had borrowed Defendant's vehicle for the week prior to his arrest during which time she purchased two firearms and stored them in the vehicle. She stated that she placed one of the firearms under the hood of the vehicle because she did not know if the firearm was stolen and "didn't want it necessarily, within like my arm's reach." Ms. Schuerenberg stated that after Defendant's arrest, she attempted to inform officers that the firearms in the vehicle belonged to her. She acknowledged that she never communicated as much with the district attorney general's office and had not testified to this in court prior to trial.

At the conclusion of the first portion of the bifurcated trial, the jury convicted Defendant of the drug charges and Counts 13 through 36, all as charged in the indictment. The second portion of the trial concerned Counts 37 through 56—Defendant's remaining firearms charges. Therein, the State submitted two certified judgments for Defendant's May 2012 convictions for possession of marijuana with intent to sell and possession of a firearm during the commission of a dangerous felony. Defendant elected not to present any proof during the second portion. The jury convicted Defendant of Counts 37 through 56 as charged in the indictment.

During the sentencing hearing, the trial court merged Counts 1 and 2; Counts 3 and 4; Counts 5 and 6; Counts 7 and 8; Counts 9 and 10; Counts 33-36; and Counts 13-32 and 37-56 into five separate counts. The trial court aligned the sentences in Counts 1-8 and 11 concurrently, the sentences in Counts 9-10 consecutively to Counts 1-8 and 11, and the sentences for the firearm-related convictions in Counts 13-56 concurrently to each other and consecutively to Counts 9-10 for a total effective sentence of sixty-six years' confinement as a career offender. [2] Defendant filed a motion for new trial, which the trial court denied following a hearing. Defendant then filed a timely notice of appeal.

## II. Analysis

### A. Motion to Suppress

Defendant argues that the trial court erred in denying his motion to suppress because the arresting officer lacked probable cause to conduct a traffic stop and to search Defendant's vehicle.[3] The State argues that Defendant has waived this issue by failing to include a transcript of the suppression hearing with the appellate record.

As the party raising the issue, it is Defendant's responsibility "to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal." *State v. Taylor*, 992 S.W.2d 941, 944 (Tenn. 1999); *see also* Tenn. R. App. P. 24(b). "It is well-established that an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue." *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). The failure to prepare a sufficient record "results in a waiver of such issues and a presumption that the ruling of the trial court was correct." *Thompson v. State*, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997).

---

[2] Defendant raises no sentencing issues on appeal.

[3] We have reorganized Defendant's issues for clarity.

Here, Defendant failed to include a transcript of the suppression motion hearing in the appellate record. While the record does include the trial court's findings of fact, without the transcript, we cannot determine whether the evidence preponderates against the trial court's findings, which is our standard of review. *See State v. Tuttle*, 515 S.W.3d 282, 299 (Tenn. 2017). Consequently, we must presume that the trial court's findings are correct.[4] As such, Defendant has failed to establish that he is entitled to relief on this issue.

## B. Sufficiency of the Evidence

Defendant argues that the evidence was not sufficient to establish his firearm convictions and his cocaine and marijuana convictions.[5] Specifically, he argues the evidence was insufficient to establish that he was in possession of a firearm and that the State did not prove the identity of the cocaine and marijuana beyond a reasonable doubt. The State argues that when viewed in the light most favorable to the State, the evidence is sufficient to sustain the convictions. We agree with the State.

## 1. Standard of Review

The standard of review for a claim challenging the sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see also State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011); Tenn. R. App. P. 13. "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." *State v. Williams*, 558 S.W.3d 633, 638 (Tenn. 2018) (citing *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011)).[6]

---

[4] We note that while the State's responsive brief put Defendant on notice of the waiver issue by its assertion that Defendant failed to include the transcript, Defendant chose not to respond to this issue in a reply brief or otherwise seek to supplement the record.

[5] Although Defendant argues that "the evidence was insufficient to sustain the jury's verdict of guilt in all counts," his appellate brief only addresses his firearm convictions and his cocaine and marijuana convictions. Consequently, Defendant has waived review of the remaining drug convictions. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); *see also* Tenn. R. App. P. 27(a)(7).

[6] Defendant cites a rejected theory that a conviction based on circumstantial evidence must "draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt." As the State correctly asserts in its brief, the Tennessee Supreme Court explicitly rejected this standard nearly a decade ago in *Dorantes*, 331 S.W.3d at 379.

A guilty verdict removes the presumption of innocence and replaces it with one of guilt on appeal; therefore, the burden is shifted to the defendant to prove why the evidence is legally insufficient to support the conviction. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)). On appeal, "we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom." *Id.* at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual disputes raised by such evidence, are resolved by the jury as the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 405, 410 (Tenn. 1990). Therefore, we are precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Stephens*, 521 S.W.3d 718, 724 (Tenn. 2017).

## 2. Possession of a Firearm

Defendant argues that the evidence is insufficient to sustain his firearm convictions. Specifically, he argues that the State failed to establish actual or constructive possession of the firearms.

Tennessee Code Annotated section 39-17-1324(a) provides that "[i]t is an offense to possess a firearm . . . with the intent to go armed during the commission of or attempt to commit a dangerous felony." Possession of a controlled substance with the intent to sell or distribute is considered a dangerous felony. Tenn. Code Ann. § 39-17-1324(i)(1)(L) (Supp. 2019). Code section 39-17-1324(g)(2) and (j) provides for mandatory minimum sentences based on the nature of the defendant's prior convictions. A person also commits an offense "who unlawfully possesses a firearm" and "[h]as been convicted of a felony crime of violence, an attempt to commit a felony crime of violence, or a felony involving use of a deadly weapon." Tenn. Code Ann. § 39-17-1307(b)(1)(A) (2018). Aggravated robbery is a felony crime of violence. Tenn. Code Ann. § 39-17-1301(3).

"In criminal cases, a possession element may generally be established by showing actual or constructive possession." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014) (citing *State v. Robinson,* 400 S.W.3d 529, 534 (Tenn. 2013)). For constructive possession to exist, "there must be proof that the accused had 'the power and intention at a given time to exercise dominion and control over . . . [the contraband] either directly or through others.'" *State v. Robinson*, 400 S.W.3d at 534 (quoting *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001)). "In other words, 'constructive possession is the ability to reduce an object to actual possession.'" *State v. Ross*, 49 S.W.3d 833, 845-46 (Tenn. 2001) (quoting *State v. Transou*, 928 S.W.2d 949, 955–56 (Tenn. Crim. App. 1996)). The determination of whether a defendant has constructive possession of a firearm is dependent upon the

totality of the circumstances in each case, and constructive possession may be proven by circumstantial evidence. *See Robinson*, 400 S.W.3d at 534.

When viewed in the light most favorable to the State, the evidence is sufficient to establish that Defendant was in possession of a firearm as charged in Counts 13 through 56. Defendant was the registered owner and driver of the vehicle wherein officers found a .40 caliber Smith & Wesson M&P Shield stored in the passenger seatback pocket and a .40 caliber Smith & Wesson SD40 underneath the hood. According to co-defendant Scruggs' testimony, Defendant moved one of the guns, later identified as the M&P Shield, from the front seat to the passenger seatback pocket when he was pulled over by police. Thus, Defendant had knowledge of the firearm's presence and personally handled the firearm just prior to his arrest. *See State v. Chism*, No. E2023-00620-CCA-R3-CD, 2024 WL 4824881, at *5 (Tenn. Crim. App. Nov. 19, 2024) (concluding a rational juror could find the defendant had possession of a firearm located in the sunglasses case of the vehicle, "well within the Defendant's reach."). According to Investigator Pomeroy, Defendant had a motive to "have weapons to protect [himself], [his] product, and [his] currency." Moreover, co-defendant Scruggs' testimony that Defendant directed Ms. Schuerenberg to pick up the firearms suggests that Defendant exercised control over the firearms when Ms. Schuerenberg informed Defendant that after the firearms were in police custody that Defendant would not be able to get them back and advised him "to drop it." Under the totality of the circumstances, there is sufficient evidence to support the jury's conclusion that Defendant was in actual or constructive possession of the firearms found within his vehicle.

While Defendant claims co-defendant Scruggs' testimony "is unreliable" because she gave police a false name, the jury was entitled to resolve questions of witness credibility as the trier of fact. *See Bland*, 958 S.W.2d at 659. Likewise, insofar as Defendant argues Ms. Schuerenberg's testimony "that she had purchased and placed the firearms in the vehicle and that [Defendant] did not know they were present in the car" absolves Defendant of guilt, we disagree. The jury heard the testimony and by their verdict chose not to credit Ms. Schuerenberg. This was the jury's prerogative, and we will not disturb the jury's findings on this issue. *Id.* As such, Defendant is not entitled to relief on this issue.

### 3. Possession of Cocaine and Marijuana

Defendant argues that the evidence is insufficient to sustain his convictions for possession of cocaine with the intent to sell or deliver, and possession of marijuana with the intent to sell or deliver. Defendant narrowly construes his argument, contending that the evidence is insufficient "due simply" to Agent Depew's testimony that she "did not perform any chemical testing on the suspected marijuana or the white powder suspected to be cocaine." In other words, Defendant argues the State did not prove the identity of the

substances. The State contends that chemical testing is not required to sustain Defendant's convictions and that the evidence was otherwise sufficient to support his convictions. We agree with the State.

It is a criminal offense for a person to knowingly possess a controlled substance with the intent to manufacture, deliver, or sell the controlled substance. Tenn. Code Ann. § 39-17-417(a)(4) (Supp. 2019). The offense is a Class B felony "if the amount involved is point five (0.5) grams or more of any substance containing cocaine." *Id.* at (c)(1). The offense is a Class E felony if the substance contains between one-half ounce and ten pounds of marijuana. *Id.* at (g)(1).[7]

"In prosecutions of drug offenses, the identity of the controlled substance is an element of the crime." *State v. Schutt*, No. M2022-00905-CCA-R3-CD, 2023 WL 6120739, at *6 (Tenn. Crim. App. Sept. 19, 2023), *no perm. app. filed*. Hence, the State was required to prove that the controlled substances were cocaine and marijuana. However, "chemical analysis is not a prerequisite to establish the identity of a controlled substance, and the essential elements of a drug related offense may be established circumstantially." *Id.* at *7; *see State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011) ("A criminal offense may, of course, be established exclusively by circumstantial evidence."); *see also State v. McDowell*, No. E2020-01641-CCA-R3-CD, 2022 WL 1115577, at *11 (Tenn. Crim. App. Apr. 14, 2022), *perm. app. denied* (Tenn. Oct. 4, 2022) (noting that "[a]lthough the substance was not tested by the TBI Laboratory, both [investigators] testified that it was visually consistent with the larger rock-like substance," which had been tested and confirmed to be cocaine base); *State v. Fleming*, No. E2014-01137-CCA-R3-CD, 2015 WL 799778, at *8 (Tenn. Crim. App. Feb. 25, 2015) (lay testimony was sufficient to establish identity of the destroyed substance given the witness's familiarity with the substance). Our supreme court has held that when accompanied by circumstantial evidence "a police officer's testimony regarding the identity of a substance as an illegal drug may be sufficient to support a conviction related to the use or possession of a drug." *McDowell*, 2022 WL 1115577, at *11 (citing *State v. White*, 269 S.W.3d 903, 907 (Tenn. 2008)). As factfinder, the jury decides the significance of the circumstantial evidence, as well as "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence.'" *Sisk*, 343 S.W.3d at 65 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

---

[7] At the time of the offenses, January 18, 2021, marijuana was statutorily defined as "all parts of the plant cannabis," as defined in section 39-17-402(16)(A) (2020). Marijuana does not include hemp, as defined in section 43-27-101. *Id.* § -402(16)(C) (2020). "Thus, in Tennessee, marijuana is defined as Cannabis sativa containing greater than 0.3% [delta-9 tetrahydrocannabinol ("THC")], while hemp is defined as Cannabis sativa containing not more than 0.3% THC." *State v. Green*, 697 S.W.3d 634, 640 (Tenn. 2024) (citing Tenn. Code. Ann. § 43-27-101(3)).

- 11 -

Here, when viewed in the light most favorable to the State, the evidence shows that Officer Morris observed Defendant engage in a hand-to-hand transaction in an area with a "drug-trafficking problem." Ms. Fitzgerald testified that when Agent Brisco effectuated the traffic stop of Defendant's vehicle, Defendant passed Ms. Fitzgerald a bag of marijuana and "told her to hide it." Both passengers in the vehicle—who smoked marijuana in the vehicle that night—identified the substance as marijuana. While Agent Brisco acknowledged at trial that hemp and marijuana smell the same, he testified that given the nature of the hand-to-hand transaction that Officer Morris witnessed, it was not probable that the exchange was for hemp. Upon contact with Defendant, Agent Brisco "got hit in the face with a strong odor of raw marijuana" emanating from Defendant's open car window. When searching Defendant's vehicle, Agent Brisco found a large, unmarked plastic bag containing a "green, leafy substance, which from [Agent Brisco's] training and experience," the agent identified as marijuana. Agent Brisco additionally located a magnetic box attached to the undercarriage of the car next to the driver's seat. This box contained marijuana; eleven individually packaged baggies of methamphetamine weighing a total of 47.73 grams; a mix of heroin and fentanyl weighing 16.13 grams; cocaine in a "bindle" and two small baggies weighing 3.59 grams; and two Suboxone strips. While the marijuana and cocaine were not laboratory tested, Agent Brisco also correctly identified the methamphetamine and mix of heroin and fentanyl and his identification of the methamphetamine, heroin and fentanyl were confirmed by the TBI laboratory. According to Investigator Pomeroy, drug dealers individually package drugs to facilitate quick transactions. In addition to the drugs, officers located approximately $4,100 in cash, along with Cash App cards. According to co-defendant Scruggs, Defendant had been selling "weed and meth" on the day he was arrested. Agent Brisco testified that a large amount of cash in conjunction with a large amount of drugs is typically drug proceeds. Finally, after being arrested, Defendant made incriminating statements when he told officers that he could help them locate "higher-level drug dealers" in exchange for avoiding jail that night.

While the cocaine and marijuana were not laboratory tested, the surrounding circumstances in which officers located the drugs and the witnesses' testimony were sufficient for a jury to find that the cocaine and marijuana were properly identified as the substances charged. The evidence is sufficient to support Defendant's convictions, and he is not entitled to relief on this issue.

### III. Conclusion

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_s/ Matthew J. Wilson_
MATTHEW J. WILSON, JUDGE
