IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 12, 2025 Session

## STATE OF TENNESSEE v. WILLIAM JOEL LAUPER

**Appeal from the Circuit Court for Rutherford County**
**No. 84811     Barry R. Tidwell, Judge**

_____

### No. M2024-00240-CCA-R3-CD

_____

The Defendant, William Joel Lauper, was convicted by a Rutherford County Jury of especially aggravated kidnapping, four counts of aggravated assault, domestic assault resulting in a bodily injury, and preventing another from making an emergency call, for which he received an effective sentence of fifty years, eleven months, and twenty-nine days of confinement. In this direct appeal, the sole issue presented for our review is whether the State established the essential element of serious bodily injury to sustain the especially aggravated kidnapping conviction. After review, we affirm.

**Tenn R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER., J., and JEFFREY USMAN, Sp. J., joined.

Christian T. Moore, Nashville, Tennessee (on appeal); Amanda J. Gentry, Nashville Tennessee, Christopher Henry Reynolds, Nashville, Tennessee (at trial), for the appellant, William Joel Lauper.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Sarah Davis and Allyson Abbot, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The facts giving rise to the Defendant's convictions stem from a domestic dispute between the Defendant and his live-in girlfriend, Christy Ann Foe, the victim in this case. After a night of drinking, the Defendant and the victim returned home. The Defendant went outside to work on a car in his garage, and the victim went inside the home and called her mother. When the Defendant entered the home and observed the victim on the phone,

he accused her of talking to another man and an argument ensued. During this time, the Defendant beat the victim, strangled her until she lost consciousness, and forced her inside of a dog cage. The victim was eventually rescued, and the Defendant was arrested. As a result of the Defendant's actions, the victim suffered excruciating pain, bruising, abrasions, lacerations, blurry vision, and a permanent scar on her head. The Defendant was subsequently indicted on March 2, 2021, by a Rutherford County Grand Jury with especially aggravated kidnapping resulting in serious bodily injury, a Class A felony, in violation of section 39-13-305 of Tennessee Code Annotated (count one); aggravated assault resulting in serious bodily injury, a Class C felony, in violation of section 39-13-102(a)(1)(A)(i) (count two); aggravated assault involving strangulation or attempted strangulation, a Class C felony, in violation of section 39-13-102 (count three); two counts of aggravated assault in violation of a restraining order, a Class C felony, in violation of section 39-13-102(a)(c) (counts four and five); domestic assault resulting in bodily injury, a Class A misdemeanor, in violation of section 39-13-111(b) (count six); and preventing another from making an emergency call, a Class A misdemeanor, in violation of section 65-21-117 (count seven).

Because the Defendant challenges only the evidence in support of the especially aggravated kidnapping conviction, we will confine our recitation of the evidence adduced at the Defendant's four-day jury trial to the testimony as relevant to this single issue. The Defendant, who was six feet tall and three hundred pounds, lived in Rutherford County with the victim, who was five feet tall and one hundred forty pounds. Prior to the instant offense, on February 15, 2019, the Rutherford County Circuit Court entered an order lifting a previous no-contact order against the Defendant and permitting "peaceful contact" with the victim. However, on October 5, 2019, the Rutherford County General Sessions Court entered another no-contact order against the Defendant, ordering him to vacate the home he shared with the victim and prohibiting his return without a police escort to retrieve his belongings. Despite the no-contact order, the Defendant continued to live with the victim in January of 2020.

On the night of January 20, 2020, the Defendant and the victim went out for drinks at a local chain restaurant. On the way home, they stopped at a liquor store. At home, they continued to drink alcohol. The Defendant also spent time working on a "four-wheeler" in the garage with the victim's help. At some point, the pair drove the Defendant's Trans Am around the block and then returned to the garage. At around 1:30 a.m., the victim went inside the house to call her mother. Shortly thereafter, the Defendant entered the house, insulted the victim, and accused her of being on the phone with another man. An argument ensued, and the Defendant grabbed the victim's head and slammed it into the bedroom door frame, leaving a large laceration on the victim's scalp and forehead that bled profusely. The victim's mother overheard part of the altercation on the phone, tried to call the victim back at least ten times, and drove to the victim's house.

After the Defendant's initial attack, the victim went to the kitchen to get her car keys and wallet, and she tried to call the police on her cellphone. The Defendant grabbed the victim's keys and wrangled the cellphone from her hand. When the Defendant took the victim's cellphone from her, he bent the victim's thumb all the way back, bruising her hand and causing her pain. The victim tried to escape to the back door, which was the only available exit from the house at the time, but the Defendant blocked her way and knocked her to the ground. When the victim attempted to crawl away, the Defendant kicked her in the ribs and dragged her back to the bedroom. The Defendant yanked her by the arm and knocked her back to the ground.

The victim was on the ground with her legs extended in front of her when the Defendant pushed her head down into her knees, folding her body "like a lawn chair" as she struggled to breathe. The Defendant then laid the victim on her back, straddled her, and strangled her until she lost consciousness. The victim was unsure how long she was unconscious. When the victim regained consciousness, the Defendant grabbed her by the hair, forced her to crawl down the hallway, kicked her into their dog's cage, and latched it shut. The victim tried to unlatch the cage, but the Defendant kicked her hand, leaving a bruise and causing her pain. After a while, the Defendant let the victim out of the cage, punched her in the face three times, and then locked her back in the cage. Once back inside the cage, the victim fell asleep. She woke to the sound of drilling and surmised that the Defendant was screwing the back door shut.

Once the victim's mother arrived at the house, she banged on the back door and received no response. She asked a neighbor to call the police, and Murfreesboro Police Officers Joshua Sandlin and Trae Smalley were the first to respond to the call. The victim's mother directed the officers to the back door, which was locked. The Defendant let the victim out of the dog's cage, and she broke a window and yelled to her mother for help. Officer Sandlin kicked down the back door, and the officers entered the house. The Defendant surrendered almost immediately, and Officer Sandlin placed him under arrest. Officer Smalley noticed a drill near the back door and saw that the door had been screwed shut from the inside. The entire incident lasted approximately 40 minutes.

At around 4:45 a.m., Jamie Wesley, a paramedic with Rutherford County EMS, arrived at the scene. He went inside the house and saw the victim sitting against the wall in a fetal position, visibly anxious and afraid. When he asked the victim "what hurts," the victim responded that "it was mostly her head and face." He evaluated the victim's injuries and noted that she had a laceration on her head that was "[a]pproximately three to four inches [long] and about an inch" deep. There was also significant facial swelling, bruising, abrasions, and other lacerations. The victim was unable to breathe through her nose due to the swelling. The victim also reported pain in her ribs and that her overall pain level was six out of ten.

The victim was taken to St. Thomas Rutherford Hospital, where she was examined by Dr. Jason Michael Rubino, a specialist in emergency medicine. The victim was experiencing "[e]xcruciating pain" over her "whole body"; however, "most of her pain was . . . from her facial contusions or bruises." At the hospital, the victim rated her pain level as eight out of ten. "She [also] had lacerations to her scalp and forehead," as well as "bruises to the bridge of her nose, and around her right eye." Dr. Rubino determined that the victim had suffered a "multiple trauma injury," and he ordered CAT scans and x-rays. The tests confirmed the victim had not suffered any life-threatening complications from her injuries. Dr. Rubino diagnosed the victim with a close-head injury, or a concussion, and closed the laceration on her scalp and forehead with staples. The wound on the victim's forehead left a permanent scar that was visible at trial.

The victim was discharged from the hospital after about four hours. Before being discharged, the victim took a shower, which was painful. Dr. Rubino "knew [the victim] was going to have headaches and pains for some time," and that her soft tissue injuries were "quite painful," so he prescribed her morphine, which he reserved for significant injuries. The victim spent "a day or so" recovering at her mother's home. The victim's pain impaired her mobility, and she needed her mother's help to eat and drink. When the victim returned home, she felt "a lot of pressure" in her eyes, and "[i]t was hard to see" out of her right eye. The victim also struggled with writing and styling her hair due to her hand injuries. The victim "still ha[d] problems" with her right eye at trial.

At the close of the State's proof, the Defendant moved for a judgment of acquittal. As relevant here, the Defendant argued the State had not introduced sufficient evidence to sustain a conviction for the offense of especially aggravated kidnapping because it failed to prove the victim had suffered serious bodily injury. The Defendant argued that "none of [the victim's] injuries were overly serious" and that they did not involve a substantial risk of death because there were no broken bones, the only treatment she received was staples, and she was released from the hospital within four hours. The Defendant argued the only proof the victim ever fell unconscious was her own testimony; otherwise, neither Dr. Rubio's testimony nor her medical records indicated that there was proof she had fallen unconscious. The Defendant also argued that "a pain level of 8 [out of] 10 doesn't seem like it's the worst pain or extreme physical pain." The Defendant argued there was no protracted or obvious disfigurement or protracted loss or impairment of a bodily member. The trial court found there was sufficient evidence to raise a jury question regarding extreme physical pain because the victim testified that she "was in a lot of pain," and had rated it an eight out of ten at the hospital. The trial court also found that the victim's scar was sufficient to send the issue of obvious or protracted disfigurement to the jury. Based on these findings, the trial court denied the Defendant's motion for judgment of acquittal.

The Defendant testified and denied that he caused the laceration to the victim's head

- 4 -

by smashing her into the door frame. The Defendant insisted that, after an argument, the victim either "head-butted" the door frame herself or "she may have tripped," at which point she started bleeding profusely. The Defendant also testified that, when he expressed concern about what happened, the victim insinuated she would blame him for her injuries. The Defendant testified that he tried to apply pressure to the wound to stop the bleeding. The Defendant also testified the victim ignored her mother's repeated phone calls to trick her mother into calling the police.

The Defendant insisted he and the victim were not fighting and that he was confused by the victim's actions. However, the Defendant admitted he "smacked" the victim "three times on the left side of her face," at which point she hid in the dog cage to get away from him. The Defendant testified that he called the victim "crazy," so she hit her head on the floor several times, which the Defendant speculated caused most of her head injuries. The Defendant also testified that he "may have" pulled the victim's hair, and he admitted to pushing her head into her lap like a lawn chair. However, the Defendant denied punching the victim with a closed fist, strangling her, and dragging her around the house.

On cross-examination, the Defendant insisted that most of the victim's injuries were self-inflicted and that she never lost consciousness. The Defendant denied strangling the victim and testified he had "no clue" what caused the swelling in her neck. He theorized it may have been due to "her head snapp[ing] back when she hit the door frame." The Defendant also admitted taking the victim's cellphone out of her hand but denied that doing so caused any injuries.

The jury found the Defendant guilty as charged on November 18, 2021. At the sentencing hearing on May 11, 2022, the trial court imposed an effective sentence of fifty years, eleven months, and twenty-nine days in confinement.

The Defendant timely filed a motion for new trial on June 8, 2022, arguing, in part, that evidence of a broken nose, without more, is insufficient to show serious bodily injury. State v. Prince, No. M2020-01302-CCA-R3-CD, 2021 WL 5710541, *8 (Tenn. Crim. App. Dec. 2, 2021). Defense counsel filed an amended motion for new trial on January 29, 2024, further arguing that the State failed to prove serious bodily injury. Following a hearing, the trial court denied the motion and determined that the victim's testimony that she suffered "excruciating pain," and the presence of a permanent scar was sufficient to show extreme physical pain and "obvious disfigurement in the form of a scar." The Defendant filed a timely notice of appeal on February 9, 2024, and this case is now properly before this court for review.

- 5 -

# ANALYSIS

The sole issue on appeal is the sufficiency of the evidence to sustain the Defendant's especially aggravated kidnapping conviction. The Defendant argues the State failed to prove the victim suffered serious bodily injury because it did not introduce evidence of "long-lasting impact or risk of life-threatening conditions." The State argues the evidence is sufficient to show serious bodily injury because the victim developed a permanent scar, suffered "excruciating" pain, and her vision in her right eye was impaired.

"Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the criminal defendant bears the burden on appeal of showing that the evidence was legally insufficient to sustain a guilty verdict." State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009) (citing State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992)). "Appellate courts evaluating the sufficiency of the convicting evidence must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)); see Tenn. R. App. P. 13(e). When this court evaluates the sufficiency of the evidence, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom. State v. Davis, 354 S.W.3d 718, 729 (Tenn. 2011) (citing State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010)).

"In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (citing Duchac v. State, 505 S.W.2d 237, 241 (Tenn. 1973); Marable v. State, 313 S.W.2d 451, 456-58 (Tenn. 1958)). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (quoting Marable, 313 S.W.2d at 457). This court may not substitute its inferences for those drawn by the trier of fact in cases involving circumstantial evidence, nor may we "weigh the evidence anew." State v. Sisk, 343 S.W.3d 60, 65 (Tenn. 2011) (citing State v. Lewter, 313 S.W.3d 745, 748 (Tenn. 2010)); State v. Stephens, 521 S.W.3d 718, 724 (Tenn. 2017) (citing Evans, 838 S.W.2d at 191). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" Dorantes, 331 S.W.3d at 379 (quoting Hanson, 38+ S.W.3d at 275.

When reviewing the sufficiency of the evidence supporting a criminal conviction, the first step is to "examine the relevant statute(s) in order to determine the elements that the State must prove to establish the offense." Stephens, 521 S.W.3d at 723 (citing State

v. Smith, 436 S.W.3d 751, 761-65 (Tenn. 2014)).  The next step is to analyze the evidence "to determine whether each of the elements is supported by adequate proof."  Id. at 724.

As charged in this case, section 39-13-305 of Tennessee Code Annotated defines especially aggravated kidnapping as "false imprisonment, as defined in [section] 39-13-302 . . . [w]here the victim suffers serious bodily injury."  Tenn. Code Ann. § 39-13-305(a)(4).  "A person commits the offense of false imprisonment [when they] knowingly remove[] or confine[] another unlawfully so as to interfere substantially with the other's liberty."  Id. § 39-13-302.  The only dispute in this case is whether the victim suffered serious bodily injury, which Tennessee Code Annotated section 39-11-106(a)(37) defines as any bodily injury that involves:

(A) A substantial risk of death;
(B) Protracted unconsciousness;
(C) Extreme physical pain;
(D) Protracted or obvious disfigurement; [or]
(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]

Tenn. Code Ann. § 39-11-106(a)(37)(A)-(E).  "'Bodily injury' includes a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty[.]"  Id. § 39-11-106(a)(3).

Viewing the evidence in the light most favorable to the State, the record shows that on the night of the offense, an argument ensued between the Defendant and the victim. The Defendant grabbed the victim's head and slammed it into the bedroom door frame, leaving a large laceration on the victim's scalp and forehead.  Photographs of the laceration on the victim's scalp and forehead were introduced into evidence.  An emergency responder testified that the laceration on the victim's head was "[a]pproximately three to four inches [long] and about an inch" deep.  When the victim was asked at trial how far the laceration went into her hairline, the victim indicated to the jury and showed a permanent scar on her head.  She further testified that the laceration had to be stapled shut, which was "very, very, very painful."  We conclude that the permanent scar is sufficient evidence for a reasonable jury to find that the victim suffered serious bodily injury involving protracted or obvious disfigurement.  See State v. Matthews, No. M2010-00647-CCA-R3-CD, 2012 WL 5378046, at *4 (Tenn. Crim. App. Oct. 31, 2012) ("When confronted with the issue of whether a permanent scar is sufficient for a jury to find 'protracted or obvious disfigurement' . . . this court has consistently determined that it is.") (collecting cases); State v. Wright, No. M2006-02343-CCA-R3-CD, 2008 WL 371258, at *7 (Tenn. Crim. App. Feb. 11, 2008) (concluding there was sufficient evidence of serious bodily injury when the victim was "struck on his head with a pistol, resulting in a scalp wound, which

required five stitches to close, and left a scar[.]").

The Defendant contends on appeal that the State was required to introduce "evidence of long-lasting impact or risk of life-threatening conditions" to prove serious bodily injury and that the State failed to do so. His argument focuses solely on the failure of the State to show the victim's injuries involved a substantial risk of death. This is one of several factors upon which the State may rely to meet the statutory definition of serious bodily injury, and the Defendant does not dispute the fact that the victim suffered a permanent scar because of his actions. Accordingly, because a reasonable jury could determine that the victim suffered serious bodily injury based on protracted or obvious disfigurement, the evidence was sufficient to sustain the Defendant's especially aggravated kidnapping conviction. The Defendant is not entitled to relief.

## CONCLUSION

Based on the foregoing, the judgments of the trial court are affirmed.

s/            Camille            R. McMullen_____
CAMILLE R. MCMULLEN, PRESIDING JUDGE

- 8 -